591 F.2d 1347
 5 Fed. R. Evid. Serv. 133
 UNITED STATES of America, Appellee,
v.
Marvin MANDEL, Appellant.
UNITED STATES of America, Appellee,
v.
W. Dale HESS, Appellant.
UNITED STATES of America, Appellee,
v.
Harry W. RODGERS, III, Appellant.
UNITED STATES of America, Appellee,
v.
William A. RODGERS, Appellant.
UNITED STATES of America, Appellee,
v.
Irvin KOVENS, Appellant.
UNITED STATES of America, Appellee,
v.
Ernest N. CORY, Jr., Appellant.
UNITED STATES of America, Appellant,
v.
W. Dale HESS, Harry W. Rodgers, III, and William A. Rodgers,
Appellees.
 Nos. 77-2487 to 77-2492 and 78-5022.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 19, 1978.
Decided Jan. 11, 1979.
 
 Arnold M. Weiner, Baltimore, Md., Lead Counsel, for appellants and for Marvin Mandel, appellant.
 Michael E. Marr, Baltimore, Md., for William A. Rodgers, appellant.
 Charles G. Bernstein, Federal Public Defender, Baltimore, Md. (Michael Schatzow, Asst. Federal Public Defender, Baltimore, Md., William C. Brennan, Jr., DePaul, Willoner & Kenkel, College Park, Md., on brief), for Ernest N. Cory, Jr., appellant.
 Eugene Gressman, School of Law, University of North Carolina, Chapel Hill, N. C., D. Christopher Ohly and M. Albert Figinski, Baltimore, Md., for Marvin Mandel.
 William G. Hundley, Washington, D. C., for W. Dale Hess.
 Thomas C. Green and William W. Taylor, III, Washington, D. C., for Harry W. Rodgers, III.
 Norman P. Ramsey and William F. Gately, Baltimore, Md., for Irvin Kovens, on brief, for appellants.
 Daniel J. Hurson, Asst. U. S. Atty., Baltimore, Md., (Russell T. Baker, Jr., U. S. Atty., and Barnet D. Skolnik and Elizabeth H. Trimble, Asst. U. S. Attys., Baltimore, Md., on brief), for appellee.
 Before BUTZNER, RUSSELL, and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Marvin Mandel, Governor of the State of Maryland, W. Dale Hess, Harry W. Rodgers, William A. Rodgers (brother of Harry Rodgers), Irvin Kovens, Maryland businessmen, and Ernest N. Cory, a Maryland attorney (hereinafter "Appellants"), appeal from their convictions for mail fraud and racketeering violations under 18 U.S.C. § 1341[1] and 18 U.S.C. § 1961 et seq.[2] (The Organized Crime Control Act), respectively. Appellants were each adjudged guilty of fifteen counts of mail fraud under § 1341 and one count of prohibited racketeering activity under § 1961 et seq.[3] Appellant Mandel was sentenced to a four-year prison term; Appellants Hess, Harry Rodgers, and Kovens were each sentenced to four years' imprisonment and fined $40,000; Appellant William Rodgers was sentenced to 20 months' imprisonment and fined $40,000; and Appellant Cory was sentenced to 18 months' imprisonment. Additionally, pursuant to 18 U.S.C. § 1963(a), Appellants Hess, Harry Rodgers, William Rodgers, Kovens, and Cory were ordered to forfeit their ownership interests in the Southern Maryland Agricultural Association, Inc., based upon their convictions under count 24 of the indictment.
 
 
 2
 The gist of the mail fraud counts of the indictment charged that beginning between January 7, 1969 and the spring of 1971, and continuing thereafter to the date of the filing of the indictment, Appellants devised and intended to devise a scheme and artifice:
 
 
 3
 "(a) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties of MARVIN MANDEL, in his official capacities as Governor of the State of Maryland, free from bribery, corruption, partiality, willful omission, bias, dishonesty, deceit, official misconduct and fraud;
 
 
 4
 "(b) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have the state's business and its affairs conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud, and in accordance with the laws and Code of Ethics of the State of Maryland;
 
 
 5
 "(c) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have available and to be made aware of all relevant and pertinent facts and circumstances when:
 
 
 6
 (1) drafting, considering and deliberating upon proposed legislation for the State of Maryland with respect to the Maryland horse racing industry and to other matters;
 
 
 7
 (2) administering the laws of the State of Maryland with respect to the Maryland horse racing industry and to other matters; and
 
 
 8
 (3) transacting business for and on behalf of the State of Maryland;
 
 
 9
 "(d) To obtain, directly and indirectly, money, property and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, relating to the Marlboro Race Track, the Bowie Race Track, the Security Investment Company, Ray's Point, Inc., and to other matters." (from count 1, para. 13, of the indictment).
 
 
 10
 Paragraphs 14 through 32 of count 1 set forth the specifics of the alleged scheme to defraud. These specifics include allegations of bribery and the misrepresentation and concealment of material information on the part of the Appellants. Counts 2 to 20 incorporate by reference the allegations contained in count 1 and charge Appellants with various particular uses of the mails in the execution of the alleged scheme.
 
 
 11
 In the racketeering counts, the government charged Governor Mandel in count 21 with acquiring and maintaining an interest in and control of the Security Investment Company through a pattern of racketeering activity that included mail fraud and bribery. Count 23 charged Hess, Harry Rodgers, and William Rodgers with conducting and participating in the conduct of the affairs of the Security Investment Company through a pattern of racketeering activity that included mail fraud and bribery. Count 24 charged Hess, Harry Rodgers, William Rodgers, Kovens, and Cory with conducting and participating in the conduct of the affairs of the Marlboro Race Track through a pattern of racketeering activity that included mail fraud.
 
 
 12
 The evidence adduced at trial focused upon the specific allegations contained in count 1 of the indictment, i. e., the alleged bribery of Governor Mandel and the alleged misrepresentation and concealment of material information on the part of Appellants. The facts developed at trial touching upon the alleged bribery of the Governor and the alleged misrepresentation and concealment of material information by Appellants were essentially uncontroverted. The dispute centered on the proper inferences that could be drawn from these facts.
 
 
 13
 The evidence adduced at trial included the following: In February 1971, the owners of Marlboro Race Track (who at the time did not include any of the Appellants), a small half-mile track located in Prince George's County, Maryland, contracted with the owners of Hagerstown Race Track, a half-mile track located in Washington County, Maryland, for the transfer to Marlboro of the 18 racing dates allotted to Hagerstown. Since the Maryland horse racing industry is regulated by the State and the permanent transfer of racing days requires the affirmative approval of the Maryland General Assembly, a bill designated as House Bill 1128 was drafted by attorneys for Marlboro and Hagerstown and submitted to the Maryland House of Delegates. The bill, as initially drafted, provided for a straight-forward approval of the transfer contract. However, prior to its passage, the bill was amended to provide that Marlboro would make its payments to the State of Maryland and then the State would make payments to Hagerstown. On May 28, 1971, Governor Mandel vetoed the bill in its amended form because he was advised that the payment provision was unconstitutional.
 
 
 14
 Subsequent to the veto, the owners of Marlboro actively began to attempt to sell the racetrack. Cory, acting on behalf of undisclosed clients, negotiated with the owners of Marlboro for its purchase. On December 31, 1971, the controlling interest in Marlboro was sold to the group represented by Cory. As of December 31, 1971, that group consisted of Appellants Hess, Harry Rodgers, William Rodgers, and Irving Schwartz, a longtime friend and business associate of Kovens. Schwartz had previously purchased 17,000 shares of Marlboro stock. At the time of settlement, the sellers of Marlboro did not know the identity of the members of the purchasing group except for Schwartz.
 
 
 15
 The purchase of Marlboro was in part financed by a $1,825,000 loan from the Suburban Trust Company. The balance of the purchase price was funded by Schwartz and Harry Rodgers. The government contended that Schwartz was merely a nominee for Kovens in the purchase of Marlboro. It introduced evidence to show that Kovens provided much of the funding for the initial purchase payments and subsequent loan interest payments made by Schwartz; that Kovens and Schwartz altered check stubs and other documents manifesting Kovens' financial involvement in the purchase of Marlboro; and that Kovens played a major role in the management of Marlboro following its purchase.
 
 
 16
 The Marlboro purchasing group did not want their identities revealed. Thus, on January 1, 1972, Eugene Casey, who had been chosen by the purchasers to act as president of Marlboro, announced at a press conference that he was the new purchaser of Marlboro. On January 7, 1972, Casey and Cory prepared and sent a letter to the Maryland General Assembly stating that Casey had recently acquired ownership of Marlboro and requested that Governor Mandel's veto of House Bill 1128 be overridden. A disputed issue of fact was whether Governor Mandel knew the true identities of the new purchasers of Marlboro.
 
 
 17
 On January 12, 1972, the General Assembly overrode the Governor's veto of House Bill 1128. As a result of the veto override, the racing days belonging to Marlboro doubled from 18 to 36. The government introduced the testimony of several Maryland state senators who stated that Senator Staten, Governor Mandel's legislative ally, said shortly before the veto override vote that the Governor would not mind if his veto of House Bill 1128 were overridden. Additionally, the government adduced testimony from some senators that if they had known of the involvement in Marlboro of the Appellants other than the Governor, and of their business relationships with Governor Mandel, they would have considered such information relevant in their consideration of the veto override.
 
 
 18
 In mid-March 1972, a bill to consolidate Maryland race tracks in a variety of ways (consolidation bill) was introduced in the State Senate. The consolidation bill, Inter alia, provided for Marlboro's racing days to be increased from 36 to 94 and provided for Marlboro to run its days at the State's two one-mile tracks. The government introduced evidence to show that Governor Mandel engaged in a strenuous lobbying effort to secure passage of the consolidation bill. It also introduced evidence that Kovens lobbied hard behind the scenes for the passage of the consolidation bill. At the time the consolidation bill was pending before the General Assembly, the true identities of the owners of Marlboro were not known. The government introduced the testimony of some members of the Maryland State Senate who stated that in deciding how to vote on the consolidation bill they would have considered it relevant to have known that Hess, Kovens, Harry Rodgers, and William Rodgers were in fact the owners of Marlboro and had provided substantial financial benefits to Governor Mandel. Appellants introduced evidence to the effect that consolidation of the racing industry had long been a topic of interest in Maryland, and one in which Governor Mandel had long played a leading role. His support of such a measure antedated by years the various incidents appearing in this case which involved Marlboro.
 
 
 19
 The consolidation bill had been embroiled in controversy since its introduction. After being passed by the Senate in amended form, it was passed by the House of Delegates in its original form and returned to the Senate for a final vote. The bill was never brought to a vote in the Senate.
 
 
 20
 A plethora of evidence was introduced on Appellants' alleged scheme to defraud by misrepresenting and concealing the true identities of the owners of Marlboro. In all the dealings between Marlboro and the Maryland Racing Commission and the General Assembly between 1972 and 1974, the fact that Hess, Harry Rodgers, William Rodgers, and allegedly Kovens, were the true owners of Marlboro was never revealed. The government contended that with a total lack of accurate information, the Maryland Racing Commission granted to Marlboro a series of administrative benefits that caused substantial profit to accrue to Hess, Harry Rodgers, William Rodgers, Kovens, and Cory. Appellants countered the government's evidence by maintaining that prior to the passage of a strict disclosure law in 1974, the use of nominees rather than publicly revealing the names of the beneficial owners of racetracks was a common and legal practice.
 
 
 21
 As an example of the alleged fraudulent concealment of the true identities of the owners of Marlboro, the government pointed to the Marlboro-Bowie merger. On December 28, 1972, Marlboro Race Track and Bowie Race Track, a one-mile track, were merged. The stock of Marlboro and the assets of Bowie were transferred to a newly established corporation, Southern Maryland Agricultural Association, Inc., with the former owners of Marlboro being issued 30 per cent of the stock in the new company. Appellants' share of Southern Maryland Agricultural Association, Inc. stock was issued to Marlboro Associates. On February 16, 1973, Hess, Harry Rodgers, and William Rodgers transferred their interest in Marlboro Associates to Cory by way of an agreement which included a non-recourse note. Under the terms of the transfer, Cory was to have five years to fund the purchase price ($630,000) himself or to arrange for the sale of the stock to a third person. If at the expiration of the five-year period the purchase price was not paid, the stock would revert to the original owners. In a document furnished to the Racing Commission in 1973, Cory was listed as the owner of the portion of Marlboro Associates formerly owned by Hess, Harry Rodgers, and William Rodgers, as well as the portion originally owned by him.
 
 
 22
 Evidence also was adduced on the flow of undisclosed financial and other benefits to Governor Mandel from some of the other Appellants. The main purpose of this evidence, from the government's standpoint, was to show that Governor Mandel took positions favorable to the owners of Marlboro on House Bill 1128 and the consolidation bill in return for these benefits.
 
 
 23
 At trial, there was evidence which tended to show that Governor Mandel, Inter alia, received the following: (1) in 1969, clothing purchased from Alper and Myers, a Baltimore clothing store, paid for by checks drawn on Charlestown Race Track, which was principally owned at the time by Kovens. Charlestown recorded the checks as expenditures for guard uniforms; (2) in 1970, a diamond bracelet for his wife, Barbara, paid for by Hess and Harry Rodgers; (3) in April 1972, clothing from Cuzzens, a Ft. Lauderdale, Florida, men's store, paid for by Harry Rodgers; (4) in September 1974, clothing from Max Margolis, a Baltimore clothing store, paid for by Kovens.
 
 
 24
 The government also placed special emphasis on Governor Mandel's involvement in Ray's Point, Inc. and Security Investment Company. Ray's Point is a parcel of land consisting of approximately 200 acres of waterfront property located on the eastern shore of Maryland. In December 1971, an investment group consisting of Appellants Hess, Harry Rodgers, and William Rodgers, and Nathan Cohen, and Thomas Hunter Lowe, Speaker of the Maryland House of Delegates, purchased Ray's Point, and, for tax purposes, formed Ray's Point, Inc. to hold the land.[4] Hess, Harry Rodgers, and William Rodgers assigned a 15 percent interest in Ray's Point, Inc. to Governor Mandel, with the 15 percent interest coming in equal shares from their respective interests. Appellant Mandel's 15 percent interest consisted of 150 shares in Ray's Point, Inc.; he paid $1 per share, a comparable price to that paid by the other shareholders. In order to finance the purchase price of the land and incidental expenses of development, Ray's Point, Inc. borrowed $350,000 on a mortgage given to the Equitable Trust Bank. The mortgage was guaranteed by Hess, Harry Rodgers, William Rodgers, and Nathan Cohen, but not by Governor Mandel or Thomas Hunter Lowe.
 
 
 25
 The first corporate minute book prepared on behalf of Ray's Point, Inc., listed the names of all the shareholders. However, subsequently a new list was prepared that omitted the names of Governor Mandel and Thomas Hunter Lowe. Governor Mandel's and Thomas Hunter Lowe's interests in Ray's Point, Inc., were reflected by stock certificates held by nominees, with Governor Mandel's certificate being held by Hess.
 
 
 26
 In May 1972, Hess assigned to Governor Mandel a 4 percent interest in Security Investment Company. Security Investment Company is a limited partnership formed in 1967 by Harry and William Rodgers, and some other persons, that, among other things, leases two office buildings to the Federal Social Security Administration in Baltimore. In March 1972, Hess was admitted as a 9 percent partner in Security Investment Company, effective retroactively to December 1971. On May 15, 1972, retroactive to January 1, 1972, Hess assigned to Governor Mandel 4/9ths of his interest in Security Investment Company. According to Hess and Governor Mandel, the assignment represented legal fees owed to Mandel for legal services rendered several years earlier, although there was evidence that the income from the Security interest was not correctly reported on the Governor's income tax return and that Hess' records with respect to the same had been altered.
 
 
 27
 Based upon the proximity between Governor Mandel's acquisition of interests in Ray's Point, Inc. and Security Investment Company, as well as his receipt of other benefits, and the Maryland General Assembly's consideration of Governor Mandel's veto of House Bill 1128 and the consolidation bill, the government argued that Mandel took positions on House Bill 1128 and the consolidation bill favorable to the owners of Marlboro Race Track in return for those financial and other benefits. Combined with the misrepresentations and concealment of the true identities of the owners of Marlboro and the financial relationships existing between Mandel and the other Appellants, the government contended that the Appellants' conduct constituted a scheme to defraud the citizens and the State of Maryland. Appellants contended that all aspects of their conduct were legally innocent and the inferences drawn by the government were unsupportable.
 
 
 28
 Appellants have raised a myriad of issues on appeal. Because we reverse their convictions for trial error committed in the court below, we do not find it necessary to express an opinion on all of the issues presented in the briefs.
 
 
 29
 * Appellants contend that their prosecution and conviction under the mail fraud statute constitutes an unwarranted overextension of that statute and an impermissible federal intrusion into the political affairs of the State of Maryland. They assert that their prosecution and conviction under § 1341 in this case constitutes an unwarranted overextension of that statute in that "there was no evidence that any state or federal law was transgressed by any of the defendants in the execution of any part of their so-called 'corrupt relationship,' or scheme to defraud. At most, the alleged scheme to defraud was but a non-criminal scheme of non-disclosure." Along the same line, Appellants cryptically state, "No previous mail fraud prosecution has permitted conviction of a public official to rest upon the slim reed of a federal prosecutor's untutored notion of what the public or the state should expect by way of an ethical and honest performance of a state official's duties. In every previous case, the criminal law or common law provided some guidance for assessing 'the loyal and honest services' of the public official." They also assert that the use of the mail fraud statute in this case constitutes an impermissible federal intrusion into the political affairs of the State of Maryland in that the government "cast the mail fraud counts of (the) indictment . . . as if the Federal Government were Parens patriae for 'the citizens of the state of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative.' " In Appellants' view, "the thrust of the indictment and the prosecution was . . . to impose mail fraud and racketeering sanctions on these defendants, including the Governor of the State, in order to insure that Maryland will in the future have more adequate disclosure requirements. (footnote omitted) In that way, presumably, the citizens, the state legislature and the state governmental agencies will have more information in arriving at political and official judgments. And in that way, the State of Maryland might in some way have a more republican and responsible form of government." Appellants maintain that use of § 1341 in such a way violates the principles of federalism so central to our form of government.
 
 
 30
 We are cognizant of the problem of the ever expanding use of the mail fraud statute to reach activities that heretofore were considered within the exclusive domain of State regulation. See United States v. Caldwell, 544 F.2d 691, 697 (4th Cir. 1976) (concurring opinion). See also United States v. McNeive, 536 F.2d 1245, 1252 (8th Cir. 1976); United States v. Edwards, 458 F.2d 875, 880 (5th Cir. 1972), cert. den., 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148. Additionally, we note that statutes such as the mail fraud statute should be carefully and strictly construed in order to avoid extension beyond the limits intended by Congress. See United States v. Kelem, 416 F.2d 346, 347 (9th Cir. 1969), cert. den., 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970). Nevertheless, we think the indictment and prosecution in this case constitute neither an unwarranted overextension of the mail fraud statute, as that phrase is used by Appellants, nor an impermissible federal intrusion into the political affairs of the State of Maryland, but as will be later noted we do not adopt the broad reading of the statute sought by the United States.
 
 
 31
 * As just stated, we think the claim that prosecution under § 1341 constitutes an impermissible federal intrusion into the political affairs of the State of Maryland and thus violates principles of federalism is without merit. The purpose of the mail fraud statute and the corresponding limits upon its appropriate use, in the context of federalism problems, is clear. The purpose of § 1341 and its predecessors is to prevent the post office department from being used to carry out fraudulent schemes. See Durland v. United States, 161 U.S. 306, 314, 16 S.Ct. 508, 40 L.Ed. 709 (1895) (interpreting a predecessor to § 1341). See also United States v. States, 488 F.2d 761, 767 (8th Cir. 1973), cert. den., 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974) (purpose of § 1341 is to prevent the misuse of the Postal Service). The constitutionality of the mail fraud statute and the limits upon its use to effectuate its purpose were stated by the Supreme Court in the following terms:
 
 
 32
 "The overt act of putting a letter into the post office of the United States is a matter that Congress may regulate. (citation omitted) Whatever the limits to its power, it may forbid any such acts done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not."
 
 
 33
 Badders v. United States, 240 U.S. 391, 393, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916) (interpreting a predecessor statute to § 1341). See also Parr v. United States, 363 U.S. 370, 389, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).
 
 
 34
 The basic purpose and scope of the mail fraud statute has been examined by numerous circuit courts as well. This court, in United States v. Brewer, 528 F.2d 492 (4th Cir. 1975), echoed the words of the Supreme Court in Durland by stating, "(the mail fraud statute) prevents the post office from being used as an instrument of crime." Id. at 498. We also followed Badders by stating that "(t)he statute does not define a scheme to defraud, and it contains no restrictive language excluding any type of fraudulent conduct in which use of the mails plays an essential rule. On the contrary, the plain language of the statute condemns any scheme to defraud in which the mails are employed . . . ." (citation omitted) Id. at 494-95. The Second Circuit has likewise recognized that the mail fraud statute's purpose and scope revolve around the misuse of the mails in Gouled v. United States, 273 F. 506, 508 (2d Cir. 1921), aff'd, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), and the Eighth Circuit has stated the purpose and scope of the mail fraud statute in almost the same language as that used by the Second Circuit in Gouled. See United States v. States, 488 F.2d 761, 764 (8th Cir. 1973), cert. den., 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). The Tenth Circuit, in United States v. Lynn, 461 F.2d 759, 763 (10th Cir. 1972), described the reach of the mail fraud statute in the following terms: "The federal mail fraud statute does not purport to reach all frauds, but only those instances in which the use of the mails is a part of the execution of the fraudulent scheme. All other cases are to be dealt with by appropriate state law." (footnote omitted).
 
 
 35
 From the foregoing discussion, it is clear that the regulation of the mail fraud statute is on the misuse of the mails, control of which lies with Congress, and not on the substance of the scheme to defraud. Even if the substance of the scheme to defraud involves matters normally within the purview of state control or regulation, once the mails are utilized to effectuate the scheme, the federal government has the right to prosecute the schemer under the mail fraud statute.
 
 
 36
 In United States v. States, supra, an attack, similar to the one made by Appellants in this case, was made on the use of § 1341, i. e., that the application of the mail fraud statute to matters traditionally left to the states violated principles of federalism. In that case, the federal government prosecuted two candidates for the office of Committeeman in the City of St. Louis, Missouri, for devising and carrying out a scheme to defraud the voters and residents of two wards in the City of St. Louis and the Board of Election Commissions of the City of St. Louis by the use of fraudulent voter registrations and applications for absentee ballots. The court stated:
 
 
 37
 "(A)ppellants argue that the application of the mail fraud statute as to the facts of this case will result in a 'policing' of state election procedure, and that Congress has never explicitly authorized such widespread intervention into state affairs. The appellants' argument misinterprets the purpose of the mail fraud legislation. The focus of the statute is upon the misuse of the Postal Service, not the regulation of state affairs, and Congress clearly has the authority to regulate such misuse of the mails. . . . The purpose of 18 U.S.C. § 1341 is to prevent the Postal Service from being used to carry out fraudulent schemes, regardless of what is the exact nature of the scheme and regardless of whether it happens to be forbidden by state law."
 
 
 38
 Id. at 766-67.
 
 
 39
 A similar holding was United States v. Mirabile, 503 F.2d 1065 (8th Cir. 1974), cert. den., 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), in which the scheme involved understatement of gross sales in monthly sales/use tax returns. We fully agree with the Eighth Circuit's statement in United States v. States concerning the proper scope of the mail fraud statute in relation to principles of federalism and, thus, reject Appellants' contention that the use of the mail fraud statute in this case constitutes an impermissible federal intrusion into the political affairs of the State of Maryland. Appellants were indicted, prosecuted and convicted for the alleged misuse of the mails and the fact that the alleged scheme to defraud involved matters traditionally of state concern is not a defense to the prosecution.
 
 B
 
 40
 We think Appellants' contention that their convictions were based on an unwarranted overextension of the mail fraud statute is likewise without merit.[5] The essence of Appellants' contention is that since the government's theory of the case did not depend upon the violation of any state or federal law, including the common law, in the execution of the alleged scheme to defraud, the indictment, prosecution and conviction under § 1341 constitute an unwarranted overextension of that statute. Our reading of the indictment and survey of the evidence adduced by the government at trial[6] reveals that Appellants were indicted and prosecuted for devising a scheme and artifice to defraud the citizens of the State of Maryland and her governmental departments, agencies, officials and employees, both executive and legislative, of the right to conscientious, loyal, faithful, disinterested and honest government through bribery[7] and non-disclosure and concealment of material information. As our discussion of the relevant case law will show, a scheme to defraud that involves bribery and non-disclosure and concealment of material information may come within the purview of the federal mail fraud statute even though no state or federal statute or common law is transgressed in terms.
 
 
 41
 Congress first enacted the federal mail fraud statute in 1872,[8] and, although it has since been amended five times, the essential elements of an offense under the statute have remained unchanged.[9] See Survey of the Law of Mail Fraud, 1975 Ill.L.F. 237, 239. Even though the mail fraud statute has been in existence for over 100 years, Congress has never defined or established the precise limits of the phrase "scheme or artifice to defraud." See United States v. McNeive, 536 F.2d 1245, 1248 (8th Cir. 1976). Perhaps it is because, as one court has aptly pointed out, "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." Weiss v. United States, 122 F.2d 675, 681 (5th Cir. 1941), cert. den., 314 U.S. 687, 62 S.Ct. 309, 86 L.Ed. 550. Nevertheless, since Congress has not attempted to define the phrase "scheme or artifice to defraud," the burden to do so has fallen on the courts. In order to determine the appropriate reach of the mail fraud statute, it has been necessary for the courts to attempt to define and establish the limits of the words "scheme or artifice to defraud" as they are used in the mail fraud statute. See United States v. McNeive, 536 F.2d 1245, 1248 (8th Cir. 1976).
 
 
 42
 In attempting to define and establish the meaning of the words, scheme to defraud, the starting point for most courts has been to discern the purpose of the mail fraud statute. As previously stated, the purpose of the statute is to prohibit the misuse of the mails. See, e. g., Durland v. United States, supra; United States v. States, supra. With this purpose in mind, numerous courts have made general statements concerning the approach courts should take in attempting to define and establish the limits of the words "scheme or artifice to defraud." For example, the Eighth Circuit has stated, "(T)he definition of fraud in § 1341 is to be broadly and liberally construed to further the purpose of the statute; namely, to prohibit the misuse of the mails to further fraudulent enterprises." United States v. States, 488 F.2d at 764. See also United States v. Keane, 522 F.2d 534, 544 (7th Cir. 1975), cert. den., 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); United States v. Buckner, 108 F.2d 921, 926 (2d Cir. 1940), cert. den., 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016.
 
 
 43
 For the most part, courts have broadly construed the words, "scheme or artifice to defraud." The result has been to include within that term many schemes involving deception which employ the mails in their execution if they are contrary to public policy and fail to measure up to accepted moral standards and notions of honesty and fair play. In Badders v. United States, 240 U.S. 391, 393, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916), the Court stated, "Whatever the limits to (Congress') power, it may forbid any such acts done in furtherance of a scheme that it regards as contrary to public policy . . . ." See also Parr v. United States, 363 U.S. 370, 389, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). This public policy reference has been followed by some courts as setting the outer limits to the term "scheme or artifice to defraud" as that term is used in the mail fraud statute, i. e., any scheme contrary to public policy that involves deception can be prosecuted under the mail fraud statute if the mails are used in the execution of the scheme. See, e. g., United States v. Edwards, 458 F.2d 875, 880 (5th Cir. 1972), cert. den., 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148. Other cases have used accepted moral standards and notions of honesty and fair play as setting the outer limits to the term "scheme to defraud." In Gregory v. United States, 253 F.2d 104, 109 (5th Cir. 1958), the court stated, "The aspect of the scheme to 'defraud' is measured by nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." To the same effect is Blachly v. United States, 380 F.2d 665, 671 (5th Cir. 1967). See also United States v. Keane, 522 F.2d 534, 545 (7th Cir. 1975), cert. den., 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); United States v. States, 488 F.2d 761, 764 (8th Cir. 1973), cert. den., 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). The Blachly court concluded by stating that this was indeed a broad definition of scheme to defraud. 380 F.2d at 671.
 
 
 44
 Early in the history of the mail fraud statute, attempts were made to severely limit the term, scheme to defraud. In Durland v. United States,161 U.S. 306, 313-14, 16 S.Ct. 508, 40 L.Ed. 709 (1895), the Supreme Court rejected the argument that the term "scheme or artifice to defraud" as used in the mail fraud statute was limited to common law concepts of fraud and false pretenses. See also United States v. McNeive, 536 F.2d 1245, 1247 (8th Cir. 1976). And the several courts that have been called upon to decide the question are uniformly of opinion that the fact that a scheme to defraud may or may not violate state law does not determine whether the scheme is within the proscription of the mail fraud statute. See United States v. McNeive, 536 F.2d 1245, 1247, n. 2 (8th Cir. 1976); United States v. Keane, 522 F.2d 534, 544 (7th Cir. 1975), cert. den., 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); United States v. States, 488 F.2d 761, 767 (8th Cir. 1973), cert. den., 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); United States v. Edwards, 458 F.2d 875, 880 (5th Cir. 1972), cert. den., 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148. As a result of the failure to limit the term "scheme or artifice to defraud" to common law definitions of fraud and false pretenses and schemes prohibited by State law, the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing.
 
 C
 
 45
 Without enumerating the various types of schemes that have been held cognizable under the mail fraud statute, it suffices to say that schemes involving bribery and some schemes of non-disclosure and concealment of material information come within the purview of the mail fraud statute.[10] See, e. g., United States v. Brown, 540 F.2d 364 (8th Cir. 1976); United States v. Bush, 522 F.2d 641 (7th Cir. 1975), cert. den., 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); United States v. Keane, 522 F.2d 534 (7th Cir. 1975), cert. den., 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); United States v. Issacs, 493 F.2d 1124 (7th Cir. 1974), cert. den., 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146; United States v. Caldwell, 544 F.2d 691 (4th Cir. 1976). At this late date, there can be no real contention that many schemes to defraud a state and its citizens of intangible rights, e. g., honest and faithful government, may not fall within the purview of the mail fraud statute. See United States v. Brown, 540 F.2d 364, 374 (8th Cir. 1976); United States v. States, 488 F.2d 761, 764 (8th Cir. 1973), cert. den., 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). Rather, the difficulty is whether the alleged scheme satisfies the fraud element of the mail fraud statute. Cf. United States v. Dixon, 536 F.2d 1388, 1400 (2d Cir. 1976) (reversal of a conviction under the mail fraud statute because an effort to avoid disclosure, although a breach of statutory obligation, was "hardly 'a scheme or artifice to defraud' ").
 
 
 46
 As to whether a scheme involving the bribery of a public official satisfies the fraud element of the mail fraud statute, the question has long since been answered in the affirmative. Although most mail fraud prosecutions of public officials that allege bribery also allege that a state bribery law or law prohibiting the taking of additional fees has been violated, see, e. g., United States v. Caldwell, 544 F.2d 691, 694 (4th Cir. 1976); United States v. Barrett, 505 F.2d 1091, 1104, n. 12 (7th Cir. 1974), cert. den., 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), such an allegation is not necessary to bring the alleged scheme within the purview of the mail fraud statute, for, as the court stated in Shushan v. United States, 117 F.2d 110, 115 (5th Cir. 1941), cert. den., 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531,
 
 
 47
 "A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public. . . . No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud."
 
 
 48
 The Shushan rationale has recently been restated by the Eighth Circuit in somewhat different language:
 
 
 49
 ". . . (I)t has been held in recent years that a public official may be prosecuted under 18 U.S.C. § 1341 if he devises a scheme whereby bribes or kickbacks are accepted in the course of conduct of his office, since such conduct operates to defraud the citizens of his government of their right to his honest and faithful services. (citations omitted)."
 
 
 50
 United States v. Brown, 540 F.2d 364, 374 (8th Cir. 1976).
 
 
 51
 It is clear from Shushan and its many following cases that the fraud involved in the bribery of a public official lies in the fact that the public official is not exercising his independent judgment in passing on official matters. See, e. g., United States v. Dixon, 536 F.2d 1388, 1400 (2d Cir. 1976) (bribery of public official constitutes fraud since the public official has been paid to act in breach of his duties). A fraud is perpetrated upon the public to whom the official owes fiduciary duties, e. g., honest, faithful and disinterested service. When a public official has been bribed, he breaches his duty of honest, faithful and disinterested service. While outwardly purporting to be exercising independent judgment in passing on official matters, the official has been paid for his decisions, perhaps without even considering the merits of the matter. Thus, the public is not receiving what it expects and is entitled to, the public official's honest and faithful service.
 
 
 52
 From the foregoing discussion, it is clear that the allegations contained in paragraphs 13(a) and (b) and 27 of count 1 of the indictment in this case constitute a scheme to defraud that is cognizable under § 1341. Those paragraphs essentially allege that Governor Mandel, in return for certain financial and other benefits, took certain positions on racetrack legislation that was before the Maryland legislature. This is a plain and simple bribery allegation; that Governor Mandel did not exercise his independent judgment on these legislative matters; rather, he was paid by some or all of the Appellants for the positions he took.
 
 
 53
 The question of whether non-disclosure or concealment, or both, of material information satisfies the fraud element of the mail fraud statute and, thus, is cognizable as a "scheme or artifice to defraud" under § 1341 is not as clear-cut as the bribery issue.
 
 
 54
 It should first be noted that a duty to disclose material information need not necessarily be based upon the existence of some statute or regulation prescribing such a duty. Rather, the duty to disclose may exist because of the relationship between the one possessing the material information and another, for example, employer-employee; public official-public body. As the Seventh Circuit recently stated:
 
 
 55
 (A)n employee owes his employer a duty of loyalty which includes a duty not to conceal facts known to him which he has reason to believe are material to the employer's conduct of its business and affairs. Thus, (a government official's) duty to disclose need not be based upon the existence of some statute prescribing such a duty.
 
 
 56
 United States v. Bush, 522 F.2d 641, 652 (7th Cir. 1975), cert. den., 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). See also United States v. Brown, 540 F.2d 364, 375 (8th Cir. 1976). But cf. United States v. Rabbitt, 583 F.2d 1014, 1026 (8th Cir. 1978) (stating that a state legislator was under no affirmative duty to disclose his interest in a matter because "(t)he Government refer(red) to no standard of conduct applicable to legislators which clearly required disclosure of (the legislator's) interest in the (matter) . . .."). So far as relevant in this case, the Governor of the State of Maryland is trustee for the citizens and the State of Maryland and thus owes the normal fiduciary duties of a trustee, e. g., honesty and loyalty. See The Declaration of Rights of the Maryland Constitution, Art. 6; Kerpelman v. Board of Public Works, 261 Md. 436, 276 A.2d 56, 61 (1971), cert. den. 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 100.
 
 
 57
 Although failure by a public official to disclose material information would constitute a breach of fiduciary duty, that breach, standing alone, could never be cognizable under the mail fraud statute, see United States v. Bush, 522 F.2d 641, 648 (7th Cir. 1975), cert. den. 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), for the mail fraud statute only reaches schemes or artifices to defraud. Thus, the breach of fiduciary duty must be linked with some actionable fraud in order for the proscriptions of the mail fraud statute to apply. Cf. United States v. Dixon, 536 F.2d 1388, 1400 (2d Cir. 1976) (effort to avoid disclosure, although a breach of obligation was "hardly 'a scheme or artifice to defraud' in the sense of the mail fraud statute . . . .")
 
 
 58
 There are two situations relevant to this case in which non-disclosure or concealment, or both, of material information may constitute actionable fraud under the mail fraud statute as well as a breach of fiduciary duties.[11] The first situation is where a public official fails to disclose the existence of a direct interest in a matter that he is passing on. Provided the requisite intent is shown, the official's failure to disclose the existence of a direct interest in a matter that he is passing on defrauds the public and pertinent public bodies of their intangible right to honest, loyal, faithful and disinterested government.
 
 
 59
 In Shushan v. United States, 117 F.2d 110 (5th Cir. 1941), cert. den., 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531, the court upheld the conviction under the mail fraud statute of one Waguespack, a member of a Louisiana parish levee board and Chairman of the Finance Committee, for receiving undisclosed fees from the underwriter of a plan to refund outstanding bonds of the levee district. Waguespack, in his official capacity, took part in the decision of whether to adopt the refunding plan. And, in United States v. Keane, 522 F.2d 534 (7th Cir. 1975), cert. den., 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976), the court upheld the conviction of Thomas Keane, former Alderman of Chicago's Thirty-First Ward and Chairman of the City Council's Committee on Finance, for his participation in a scheme to purchase, through an investment company, tax delinquent property from county-sponsored scavenger sales. Keane voted on certain matters that favorably affected property the investment company had purchased without disclosing his interest to the other aldermen. For other examples of courts deeming a public official's non-disclosure of a direct interest in matters that he is passing on supportive of a violation of the mail fraud statute, see, e. g., United States v. Brown, 540 F.2d 364, 374-75 (8th Cir. 1976); United States v. Bush, 522 F.2d 641, 648 (7th Cir. 1975), cert. den., 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).
 
 
 60
 The other situation applicable here in which we think fraudulent non-disclosure or concealment of facts may be evidence to support a conviction under the mail fraud statute is when there has been a fraudulent statement of facts, or a deliberate concealment thereof, to a public body, in order to receive a benefit by action of the public body. The scheme to defraud can in such a case be said to encompass not only the receipt of the illicit benefit, but also the deprivation of the public of the right to have its officials act on other than false information.[12] This is the type of fraud prosecuted in United States v. Feinberg, 535 F.2d 1004 (7th Cir. 1976), cert. den., 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300, in which the mails were used to carry out a scheme to procure a lower tax assessment by falsely representing the demolition date of buildings to the Office of Real Estate Board of Appeals of Cook County, Illinois. Similarly, in United States v. Flaxman, 495 F.2d 344 (7th Cir. 1974), cert. den., 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306, a conviction was sustained for making a false retailer's occupation tax return to the State of Illinois, the return being made by a Certified Public Accountant, in connivance with the owner of a store; and in United States v. Mirabile, 503 F.2d 1065 (8th Cir. 1974), cert. den., 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653, the court sustained the conviction of a restaurant owner who had understated gross retail sales in a sales/use tax return mailed to the Missouri Department of Revenue.
 
 
 61
 As these principles apply to the case at hand, it is apparent that the mail fraud case could have been submitted on either or both of two theories on the indictment and record now before us. First, that Governor Mandel had either been bribed as a part of a scheme to defraud or that attempts had been made to bribe Governor Mandel as a part of such scheme. Second, that false information was presented to, or true information concealed from, the Maryland General Assembly or Maryland Racing Commission, or both, in order to induce those bodies to take favorable action toward those interested in Marlboro, and later Bowie. It is equally as apparent that the case could not have been submitted on the theory that Governor Mandel had a direct interest in the racetrack business, for no direct connection on his part was either alleged or proven.
 
 II
 
 62
 Appellants further contend that the district court erred in rejecting certain of their proffered instructions and in omitting certain instructions in its charge to the jury on the mail fraud counts of the indictment. The essence of this argument is that the jury was inadequately charged on the law with regard to the mail fraud counts. They attack the district court's failure to give a bribery instruction in connection with the mail fraud counts as well as the failure to give an instruction relating to Governor Mandel's knowledge of the ownership of Marlboro.
 
 
 63
 We have previously set forth the law applicable to the mail fraud counts of the indictment. Based upon the indictment and record in this case, Appellants could have been convicted of mail fraud only if one or more of the following schemes to defraud were proven: a scheme involving the bribery or attempted bribery of Governor Mandel; or, a scheme involving the fraudulent misrepresentation of facts to, or such concealment of true facts from, the Maryland General Assembly and the Maryland Racing Commission for the purpose of obtaining legislation, racing days, and other things financially beneficial to those interested in Marlboro and later Bowie.
 
 
 64
 In its charge to the jury on the mail fraud counts of the indictment, the district court did not instruct the jury on the law of bribery. The terms bribe, bribery, and in return for were not defined for the jury. As we said in United States v. Arthur, 544 F.2d 730, 734, 735 (4th Cir. 1976), "not every gift, favor or contribution to a government or political official constitutes bribery. . . . 'Bribery' imports the notion of some more or less specific Quid pro quo for which the gift or contribution is offered or accepted. . . . The crucial distinction between 'goodwill' expenditures and bribery is . . . the existence or nonexistence of criminal intent that the benefit be received by the official as a Quid pro quo for some official act, pattern of acts, or agreement to act favorably to the donor when necessary." We think that it was necessary for the district court to give Arthur type instructions in its charge to the jury on the mail fraud counts.[13] It is indisputable that based upon the allegations contained in the indictment[14] and evidence adduced at trial the jury could have premised appellants' convictions of mail fraud on a finding that a scheme to defraud involving bribery existed. The failure by the district court to instruct the jury on the distinction between legally innocent benefits and bribes in the context of the mail fraud counts leads us to the conclusion that the jury may easily have been misled. If the jury found no bribery, it could not have convicted on that theory, although it might have on the alternate theory of furnishing false facts or concealment of true facts, as we have discussed earlier.
 
 
 65
 Appellant Mandel also contends that the district court erred in refusing to instruct the jury of the necessity of finding that he had knowledge that some or all of the other Appellants were the true owners of Marlboro Race Track at the time the racetrack legislation was before the Maryland General Assembly before the jury could find him guilty of mail fraud. The point is well taken, although the proffered instruction is too broad on its face.
 
 
 66
 We think it was necessary for the jury to be charged that Governor Mandel could not be convicted under § 1341 for engaging in a scheme to defraud that involved the fraudulent misrepresentation of facts to, or such concealment of material information from, the 1972 Maryland General Assembly, without first finding that he knew that some or all of the other Appellants were among the true owners of Marlboro Race Track during the 1972 session of the Maryland General Assembly. The gist of this part of the case was that Governor Mandel and the other Appellants misrepresented or concealed the names of the true owners of Marlboro from the Maryland General Assembly during its 1972 session for the purpose of obtaining legislation financially beneficial to Marlboro. If Governor Mandel did not know who any of the real owners of Marlboro were during the 1972 legislative session of the Maryland General Assembly, he could hardly have participated with specific intent, in the context of this case, in a scheme to defraud that involved the misrepresentation or concealment of the names of the true owners of Marlboro from the Maryland General Assembly. No similar question is raised with respect to the Racing Commission.
 
 III
 
 67
 Appellants also argue that the trial court committed error by allowing the government to introduce certain parts of the Maryland Code of Ethics (found in Annotated Code of Maryland, 1977 repl. vol. p. 568) into evidence to prove circumstantially an intent to defraud on the part of Governor Mandel. The government made use of the Code in its cross-examination of him, and the Code was available to the jury during its deliberations. The prosecutor described it as a "significant piece of evidence," and also stated that to describe its impact as "devastating" . . . "would not be too far off the mark." "Read it when you are in the jury room, take a look at it and see what it says," the prosecutor argued to the jury in his closing argument.
 
 
 68
 Appellants' argument centers on the fact that the Code of Ethics did not apply to Mandel as governor. The parties agree on that, and the jury was so instructed; however, the jury was instructed it might look to the Code to determine whether "Defendant Mandel acted with intent to defraud." The government contends, and the trial court agreed, that the Code is relevant and admissible as circumstantial evidence to show an intent to defraud. Several arguments have been advanced on this point. The initial trial judge discussed the issue when ruling on a motion to strike references to the Code of Ethics in the indictment. United States v. Mandel, 415 F.Supp. 997, 1008-09 (D.Md.1976). He granted this motion, but held that his action had no effect on the government's ability to proceed with its case since it was not necessary to show a violation of state laws or regulations to obtain a conviction under the mail fraud statute. The court went on to discuss the potential admissibility of the Code at trial to show an intent to deceive, and concluded that the final answer to this question would depend upon the other evidence introduced at trial.
 
 
 69
 The court based its argument on an analogy to the admissibility of violations of "commonly accepted standards of honesty and fairness" to show intent. But, in its previous discussion of these common standards the court clearly bottomed its argument on the fact that a violation of these standards would be "fraud" cognizable under the mail fraud statute; and further, as a matter of general criminal law, a jury could infer an intent to defraud based on the acts which make up the crime itself. The analogy breaks down at this point. The Governor of Maryland is a public trustee, and thus owes a fiduciary duty to the people of Maryland. See The Declaration of Rights of the Maryland Constitution, Art. 6, Kerpelman v. Board of Public Works, 261 Md. 436, 276 A.2d 56 (1971) (Article 6 sets forth the well-established doctrine that the duties of public officials are fiduciary in character and are to be exercised as a public trust). While violation of commonly accepted standards of fairness might very well constitute a breach of a fiduciary's duty and thus apply to Governor Mandel, the same is not true with respect to the Code of Ethics. The code clearly does not apply to the Governor of Maryland the Code proscribes not only impropriety, but the appearance of it, a matter the Maryland legislature has left to the polls rather than the courthouse for decision in the case of elected officials. We do not think that a breach of an inapplicable Code of Ethics should give rise to a violation of federal criminal law. This is especially true in the case before us since the intent of Governor Mandel is one of the principal factual issues in the case.
 
 
 70
 We have considered a similar issue tangentially in United States v. Morlang, 531 F.2d 183, 191 (4th Cir. 1975). Morlang involved the bribery of a federal official, and as part of the jury instructions the district judge read portions of the "Standards of Conduct" which described the conduct and responsibilities of employees of the Department of Housing and Urban Development. We held that the judge was correct in instructing the jury on the specific standards in the HUD regulations, but that it was error to instruct the jury on the broad general precepts found therein. For example, the HUD Standards placed a duty on the defendant "not to 'impede Government efficiency or economy' . . . or 'affect adversely the confidence of the public in the integrity of the Government . . .' " 531 F.2d at 192. These general standards were held to be "too indefinite and vague to be a part of our criminal law." Id. Thus in Morlang, we excluded admittedly applicable standards because they were too vague to support a violation of the criminal law. In our case, the trial court admitted specific standards into evidence, but these standards were admittedly inapplicable to the defendant. We feel, however, that the same principles should apply in both cases. If the Code cannot be used to define Mandel's duties as governor, we do not think it is admissible here to show an intent to defraud.
 
 
 71
 Even assuming the admissibility of certain narrow parts of the Code, the broad reach of the parts that were admitted, which the government specifically requested the jury to read, are subject to the same infirmity as the objectionable regulations in Morlang.
 
 
 72
 We note our ruling on this issue will not necessarily, or even probably, affect the admissibility of evidence on retrial,[15] for measured against the applicable standard of the Maryland Constitution, or the general law of fraud, the relevance of evidence now in the record would not be much different, if any. But, to repeat, we do not think admittedly inapplicable standards of conduct had a proper place in the trial, especially when perfectly valid standards existed.
 
 IV
 
 73
 As the central part of its case, the government attempted to prove that Governor Mandel took certain positions on racetrack legislation in return for gifts he received from the other defendants. Specifically, the government alleged that Mandel failed to oppose efforts to override his veto of a bill which would have given Marlboro, which was owned by several of the defendants, additional racing days; and that he supported a racetrack consolidation bill which would have allowed Marlboro, a half-mile track, to run racing days at a one-mile track, and thereby greatly increase its profitability. As part of its proof on both of these points, the government introduced testimony of several Maryland state senators who were present during the lobbying and voting on these two bills. Defense counsel raised repeated and continuing objections to this testimony on the grounds that it violated the rule against hearsay, it was not based on first-hand knowledge, it was irrelevant, and that it constituted an improper inquiry into legislative motive.
 
 
 74
 The district court held that the evidence was admissible under Federal Rule of Evidence 803(24), the catch-all exception to the hearsay rule. We do not agree. We have reviewed the testimony of the state senators, and while portions of the testimony may be admissible, a part must be excluded because it violates the rule against hearsay and the rule requiring personal knowledge. While the relevance of a part of the testimony is doubtful, we believe that some relevance problems can be cured by cross-examination. The types of testimony given by the senators can be divided into several more or less discrete categories. The testimony of an individual senator may fall within several of these categories, and thus for purposes of our review we feel that an analysis by category is more appropriate than a witness by witness discussion.
 
 
 75
 With regard to the racetrack consolidation bill, at least one senator testified to the substance of meetings he had with Governor Mandel and statements made by Mandel during the meetings. This evidence is admissible as a statement by a party-opponent, and, indeed, it is not considered hearsay as that term is defined in the Federal Rules of Evidence. FRE 801(d)(2)(A). On this theory, statements by Governor Mandel's agents concerning the Governor's views on the veto override also are admissible. FRE 801(d)(2)(D). A question here, of course, is who were Governor Mandel's agents. His legislative aides (employees, not members of the senate) were his agents, and their statements on Governor Mandel's views were within the scope of the agency relationship. However, it is equally true that Senator Staten was not Mandel's agent, and the substantial testimony by others relating Staten's statements of Governor Mandel's views would not be admissible. The government attempted to prove that Staten was one of Mandel's chief spokesmen on the Senate floor, but the trial court ruled that this did not establish an agency relationship. This ruling was not clearly erroneous.
 
 
 76
 Several senators also testified to certain non-verbal conduct by Mandel's legislative aides, particularly with regard to the degree of their lobbying efforts on these two bills. This evidence was offered to prove the presence or absence of lobbying on particular bills which in turn was used to infer Mandel's position on the legislation. Under the Federal Rules of Evidence, this evidence is not hearsay, and is admissible if relevant. FRE 801(a) and (c). While the probative value of this evidence may be arguable, we are not prepared to say that it is irrelevant since the degree of lobbying by Governor Mandel's agents may bear some relationship to the position the Governor takes on a specific bill. A problem is that the presence or absence of lobbying activity may be due to any number of reasons unrelated to Governor Mandel's support for a particular piece of legislation; and, it is one thing to say that the Governor supported or approved a bill, and quite another to say he did so in return for a bribe. If such conduct is entirely unrelated to the legislative question, of course it should be excluded; however, we feel that any weakness in such evidence can usually be remedied by cross examination, and that its relevance is ordinarily a matter of discretion for the trial court.
 
 
 77
 We now turn to that portion of certain senators' testimony in which the witness testified to statements of Governor Mandel's position made by declarants other than Governor Mandel or his agents. Important testimony of this type was given by senators who testified to statements made by Senator Staten. Also important, however, were statements by unidentified declarants, statements relating to the general discussion among the senators, statements concerning discussions with other senators, and testimony by one senator relating the feelings of other senators.
 
 
 78
 This case does not require an exhaustive review of the history and purposes behind Rule 803(24). It should be noted, however, that the rule was not designed as a broad exception and does not give the trial judge unfettered discretion to admit otherwise inadmissible hearsay. The rule is designed to fill in omissions of other exceptions and to allow for the development of new general exceptions to the rule. See Advisory Committee Notes to Rule 803(24). A proponent of evidence under this rule must satisfy five requirements before evidence will be admitted: (1) the proffered evidence must have "circumstantial guarantees of trustworthiness" equivalent to evidence admitted under established hearsay exceptions; (2) the statement must be "offered as evidence of a material fact", (3) "the statement (must be) more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"; (4) the general purposes of the rules and the interests of justice will "best be served by admission of the statement into evidence"; and (5) the proponent must give the opposing party adequate notice that this exception will be used, "including the name and address of the declarant."The evidence offered by the government does not meet the requirements of this exception.
 
 
 79
 With respect to those statements where the declarant is unidentified, the government has not met the notice requirement because the names and addresses of the declarants were not given. The government argues that the possible declarants are limited to the members of the Maryland Senate, but we do not believe this argument meets the letter or spirit of Rule 803(24). The rule, in terms, requires the proponent to give the name and address of the declarant, and given the general proposition that the rule is not to be construed broadly, we see no reason to depart from its plain requirements.
 
 
 80
 We also do not believe the evidence in question possesses the guarantees of trustworthiness required by Rule 803(24). The government argues that since several senators testified on this point, that sheer numbers lends credibility to their testimony. Second, the argument goes, the declarants, although at times unidentified, are limited to a discrete group, nearly all of whom were available to the defense as witnesses. Third, the government points out that the senators were testifying about events uniquely within their expertise as senators and that this adds to the overall trustworthiness of their testimony. Finally, the government states that the evidence is crucial to its case because of the difficulties of proof inherent in cases of this type.
 
 
 81
 We are not persuaded by the government's arguments. First, the senators who testified all say that someone else said that Governor Mandel did not care whether his veto was overridden. No senator seems to have testified that Governor Mandel told him that the Governor did not care. Important also is the whole setting from which this testimony is drawn. We are dealing with a purely legislative political scene. Some of the most damaging hearsay statements were repeated by long-time political enemies of the Governor. Further, the statements were made on and around the senate floor in the heat of political battle, where rumors, opinion and gossip abound. We are not dealing with an objectively observable factual event. We are dealing with circumstantial proof of the position a governor took on two pieces of legislation. Evidence based on rumors and general discussions is the worst type of hearsay. Such testimony, especially from unidentified declarants, does not possess the requisite guarantees of trustworthiness to justify a new exception to the hearsay rule.
 
 
 82
 We also do not feel that the purposes behind the Federal Rules of Evidence or the interests of justice justify admitting this evidence. In a criminal case we must be careful that a conviction is not based on speculation. When combined with arguably relevant non-verbal evidence of acts by Governor Mandel's agents discussed above, the hearsay admitted by the trial court must have been quite prejudicial to the defendants.
 
 
 83
 A final category of testimony involves the distinction between the rule against hearsay (FRE 802) and the rule requiring personal knowledge (FRE 602). Senators who were present testified to their own general feelings or beliefs as to Governor Mandel's position on the veto override. While this testimony is not hearsay in form, the feeling and beliefs expressed therein were often based in whole or in part on impermissible hearsay. To the extent it was based on hearsay, this testimony is inadmissible because the witness lacked the requisite first-hand knowledge.
 
 
 84
 FRE 602; McCormick on Evidence §§ 10, 247. While the distinction between such evidence and hearsay is sometimes formal, and the line between the rules often is blurred in practice, the rules do demonstrate that testimony based on hearsay is equally inadmissible as direct hearsay testimony. Therefore, if a senator testified that he did not believe that Governor Mandel wanted his veto overridden, and if that belief were based on inadmissible hearsay statements, then the senator lacks any personal knowledge of the event and his testimony should have been excluded.
 
 
 85
 The more difficult problem arises when the witness' belief[16] is based in part on admissible testimony. We think this problem is one of degree. If the belief is primarily based on hearsay, it is inadmissible. But, if the belief is substantially based on admissible evidence, such as direct statements or acts by one of Governor Mandel's agents, then it should be admitted. The basis for the belief should be explored in each instance and a ruling on admissibility made when those facts are before the trial court.
 
 
 86
 Our discussion above is admittedly quite general. However, as explained, substantial portions of the senators' testimony is inadmissible. We have examined the more notable examples to provide the trial court with some guidance for the new trial which must be granted on this and other grounds.
 
 
 87
 We do not believe the testimony elicited was an impermissible inquiry into legislative motive. The questions before the court were what actions, if any, Governor Mandel took with respect to the two pieces of legislation, and his motive for any acts, not the motive of the legislature, which was only at issue tangentially, if at all. The statements in Fletcher v. Peck, 6 Cranch. 87, 3 L.Ed. 162 (1810), and Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that legislative motive may not be inquired into, do not apply in this case.
 
 V
 
 88
 Defendant Cory argues that the trial court committed error by restricting the impeachment of Katherine O'Toole, a former secretary in his office and a key government witness against him. Cory had called a former co-worker of O'Toole's to testify as to her opinion of O'Toole's character with respect to truth and veracity.
 
 
 89
 While the record is not exactly clear as to the exact reason for the restriction of the impeaching testimony, whether for an insufficiently detailed foundation being laid, or because the limitation to the community in which O'Toole lived, we think a broader scope should have been allowed.
 
 
 90
 Rule 608(a) changed the common law rule which would admit only knowledge of reputation for truth and veracity as impeaching evidence under the circumstances present here. The rule now permits either knowledge of reputation for truth and veracity or opinion thereof, which the rule calls "character for truthfulness or untruthfulness."
 
 
 91
 This is made clear by the Senate amendment, adding "opinion or", which was adopted by the conference committee. See Redden & Salsburg, Federal Rules of Evidence Manual, p. 173 et seq. So the inquiry under the new rules is not limited as heretofore to knowledge of reputation for truth and veracity, but also may include opinion of character for truthfulness or untruthfulness.
 
 
 92
 We also think there should be no restriction necessarily limited to the community in which the witness sought to be impeached lives, and that the realities of our modern, mobile, impersonal society should also recognize that a witness may have a reputation for truth and veracity in the community in which he works and may have impressed on others in that community his character for truthfulness or untruthfulness. Therefore, we believe the community in which the witness worked, the law office of Cory in this instance, was a proper locality in which to prove O'Toole's reputation or character for truthfulness or untruthfulness. We do not imply that such character in the community in which she lived might not have been proved. Both McCormick on Evidence, 2d Ed. § 44, and Wigmore on Evidence, Chadbourn Rev. 1974, § 1616, take this view.
 
 
 93
 Finally, we think the trial court should have considerable discretion in determining whether the impeaching witness is qualified to speak on the subject; for example, how well the impeaching witness knows the witness sought to be impeached, under what circumstances, etc. We do not think the district court abused its discretion in that respect.
 
 
 94
 On retrial, our opinion here should govern efforts to impeach Katherine O'Toole.
 
 VI
 
 95
 Defendant William A. Rodgers argues that due to the disparate weight of the evidence against him as compared to the other defendants, and because of the potential for confusion between William A. Rodgers and his brother, co-defendant Harry W. Rodgers, III, he should have been granted a severance from the other defendants pursuant to FRCrP 14. Generally, persons who are indicted together should be tried together. United States v. Shuford, 454 F.2d 772 (4th Cir. 1971). This rule is especially important when one crime may be proven against two or more defendants on the same evidence. Id. This general preference must give way, however, when a particular defendant demonstrates that joinder will prevent him from receiving a fundamentally fair trial. The determination of whether joinder is prejudicial generally is left to the discretion of the trial court, and an appellate court should not order severance of defendants properly joined under FRCrP 8 unless the trial judge has abused his discretion. United States v. Chramek, 331 F.2d 380 (4th Cir. 1964), cert. den., 379 U.S. 822, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964). We have reviewed William Rodgers' claim in this case and do not think the trial court was in error. Severance will not be granted when the claim is based on the disparity of evidence adduced against individual defendants without a strong showing of prejudice, not present here. United States v. Smolar, 557 F.2d 13, 21 (1st Cir. 1977), cert. den., 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977). Any prejudicial confusion caused by the fact that two of the defendants were brothers was eliminated by the instructions given by the trial court.
 
 VII
 
 96
 Should the improperly admitted evidence be removed from the case, and the jury instructed properly, the question may be put as to whether the government has presented legally sufficient evidence to sustain a conviction. We should note that while it is clear that each defendant has questioned the sufficiency of the evidence with respect to his individual participation, it may be argued that they have not appealed as a group from the denial of their motion for judgment of acquittal based on the insufficiency of the evidence to support a finding of a scheme to defraud. However, we need not pass on that matter, because, for the reasons stated below, we do not reach the question of the sufficiency of the evidence as to any individual case or count, or as to the case taken as a whole.
 
 
 97
 28 U.S.C. § 2106 gives the Courts of Appeals broad remand powers, including the entry of "appropriate" judgments or "further proceedings" that may be "just under the circumstances." In Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), the Supreme Court interpreted § 2106 broadly and held that it authorized a remand for a new trial where a conviction was reversed solely due to the insufficiency of the evidence. After Bryan, the federal courts used their § 2106 power in a wide variety of settings when there was a finding of evidentiary insufficiency. E. g., Forman v. United States, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960) (new theory of the case by government); United States v. Parks, 460 F.2d 736 (5th Cir. 1972) (insufficient proof to rebut prima facie case of insanity); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1958) (government may be able to introduce better evidence at retrial); United States v. Dunn, 299 F.2d 548 (6th Cir. 1962) (trial error including inadmissible evidence); United States v. Patterson, 422 F.2d 1204 (4th Cir. 1970) (intervening change of law). And, by analogy, it has been held, correctly we think, that if a new trial must be granted for other reasons, the sufficiency of the evidence issue need not be reached. E. g., United States v. Fiore, 443 F.2d 112 (2d Cir. 1971), cert. den., 410 U.S. 984, 93 S.Ct. 1510, 36 L.Ed.2d 181 (1973); United States v. Garguilo, 310 F.2d 249 (2d Cir. 1962).
 
 
 98
 In Fiore, Bennett, a key government witness who had testified before the grand jury, refused to take the testimonial oath and refused to answer any questions at trial. The trial judge granted the government's request to examine Bennett as a hostile witness, and the prosecutor then questioned him by reading directly from Bennett's former grand jury testimony. The court reversed, and held that admitting this evidence violated the rule against hearsay and the confrontation clause of the Sixth Amendment. 443 F.2d at 115. Fiore also had moved for dismissal of the indictment, arguing that there was insufficient evidence to support the jury's verdict. The court denied this motion, saying:
 
 
 99
 We are by no means certain that, in the absence of any significant evidence by the defense, the testimony of the agents was not sufficient to take the case to the jury. Furthermore, no one can be sure that Bennett's attitude at a second trial will be the same as at the first. The record does not disclose the length of his New York sentence; as he approaches the end of it or if he is now or soon becomes eligible for parole, the prospect of a federal sentence for contempt may have a more chastening effect. If this does not happen, it is not beyond possibility that the Government may be able to establish that Bennett's recalcitrance was due to "the suggestion, procurement or act of the accused." 443 F.2d at 116.
 
 
 100
 Thus, while the court felt that the evidence might be sufficient to send the case to the jury, it did not feel required to answer the question since the circumstances warranted a new trial in any event.
 
 
 101
 The same court used the same technique in Garguilo, supra, where a conviction was reversed due to an incorrect jury charge on aiding and abetting. In refusing to pass on the sufficiency of the evidence, it said:
 
 
 102
 If the evidence against Macchia passed the test of sufficiency applicable to a criminal case, it did so, as was said in United States v. Lefkowitz, supra, 2 Cir., 284 F.2d 310 at 315, "only by a hair's breadth". We are not here required to make so fine a judgment, since we believe reversal for a new trial to be called for in any event. 310 F.2d at 254.
 
 
 103
 Of course, the proceedings authorized by Congress in § 2106 are limited by the Constitution, and it has been argued that the practice of remanding for a new trial after a finding of insufficient evidence violates a defendant's rights under the double jeopardy clause of the Fifth Amendment. In Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), the Supreme Court rejected this argument, although later cases may not be in entire agreement as to the rationale for this result. See Sapir v. United States,348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955) (Justice Douglas concurring); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Forman v. United States, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960). These ambiguities were discussed and to some extent resolved last June in Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The issue presented in Burks was "whether an accused may be subjected to a second trial when conviction in a prior trial was reversed by an appellate court solely for lack of sufficient evidence to sustain the jury's verdict." The Court held that a retrial under these circumstances would violate the double jeopardy clause, and that this result did not depend in any way on whether the defendant had asked for a new trial as part of his claim for relief. Id. at 16, 98 S.Ct. 2141. The Court was careful to point out that the decision in no way questioned prior holdings which allow a retrial when a conviction is reversed due to trial error. Id. at 12, 98 S.Ct. 2141. Thus, after Burks, two propositions are clear: (1) if a conviction is reversed solely due to evidentiary insufficiency the double jeopardy clause requires that the court of appeals cause the entry of a judgment of acquittal; and (2) if a conviction is reversed solely due to trial error, then retrial is constitutionally permissible.
 
 
 104
 The remaining question is whether a new trial may be ordered when questions going to trial error as well as evidentiary insufficiency have each been raised on appeal. In a case decided the same day as Burks, the Court left a similar question open. Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). In Greene, the petitioner's conviction was reversed and remanded for a new trial by the Florida Supreme Court, but it was not clear whether a majority of that court had based its decision on trial error or evidentiary insufficiency. The per curiam opinion reversed for insufficient evidence, but three of the four judges who joined this opinion concurred in an opinion which only discussed the trial error in admitting hearsay evidence. Thus, it was not clear if the three concurring judges agreed only with the result of the per curiam opinion new trial, or whether they felt that after the hearsay evidence was excluded insufficient evidence remained to support a conviction. The United States Supreme Court remanded the case for a determination of which alternative reading was correct and expressly reserved the question of the double jeopardy consequences if the reversal was because the legally competent evidence was insufficient to prove guilt. Id. at 26, n. 9, 98 S.Ct. 2151.
 
 
 105
 Our question is similar to the one left open in Greene. When the inadmissible evidence is removed from consideration, it is arguable there is insufficient evidence to support a conviction on at least some theories of the case. This problem is exacerbated by the fact that the jury was instructed incorrectly and thus its verdict may not have been based on applicable law.
 
 
 106
 The double jeopardy clause serves to protect a defendant against multiple prosecutions, but it must be remembered that society has a "countervailing interest in the vindication of criminal justice," and that both the state and the defendant have an interest in an error free determination of the merits of the case. Green v. United States, 355 U.S. 184, 219, 78 S.Ct. 221, 240, 2 L.Ed.2d 199 (1957) (Justice Frankfurter dissenting). These competing interests appear to be at the core of the distinction between the double jeopardy consequences of a reversal for trial error and insufficient evidence.
 
 
 107
 When an appellate court determines that the evidence presented to the jury was legally insufficient to support a conviction, it is holding that the government's case was so weak that it should not have gone to the jury, or that a judgment of acquittal should have been granted after the jury returned its verdict. When the evidentiary insufficiency is the sole issue on appeal, it has been forcefully argued that the government has had its chance and should not be allowed another trial. Since no trial error occurred (the sole issue being evidentiary sufficiency), a retrial would give the government a second opportunity to prove the identical point at issue in the first trial. This, of course, was the situation present in Burks.
 
 
 108
 When a conviction is reversed for trial error, however, different considerations are involved. In cases where the sufficiency of the evidence has not been questioned, no problem is presented, for the error is procedural only, although it may be of constitutional dimension. The hard question is whether an appellate court must decide the question of the sufficiency of evidence if it has been presented in a case which would have to be reversed in all events for procedural error. We are of opinion that ordinarily an appellate court should not be required to decide that question, although we can envision the extraordinary case which might demand it. In many cases, such as the one at bar, with a vast volume of evidence, it would be doing a distinct disservice to the defendants to decide on appellate review that if a part of the evidence had been omitted the balance would be sufficient to convict. Among other things, this rather invades the province of the jury and the trial court on retrial. The jury is the proper trier of the facts, including the credibility of witnesses and the inferences to be drawn from the testimony. Perhaps the faulty evidence was the key to the jury's decision; perhaps it was not. Who can say? Certainly not a court of appeals which has neither seen the witnesses nor heard them testify.
 
 
 109
 Another reason for not requiring an appellate court to adjudge the sufficiency of the balance of the evidence, when a part of the evidence has been improperly admitted, is that it is impossible to say what other evidence the government might have produced had the faulty evidence not been admitted, and what theory of the case the government might have principally pursued had it been presented in the context of different evidence before the jury.
 
 
 110
 Thus, we believe it does a service neither to the defendants nor to the government to adjudicate the sufficiency of the balance of the evidence when important evidence has been ruled to be inadmissible. To do so, it would be necessary to some extent to set ourselves up as triers of fact, which should be avoided, if possible. As well, we would be required to speculate as to whether or not the government would have conducted the prosecution in any different manner had the faulty evidence been excluded.
 
 
 111
 We do not, then, pass upon the sufficiency of the evidence in this case, leaving that question in the first instance to the trial court and jury on retrial.
 
 VIII
 
 112
 After the jury returned its verdict, the district judge entered a judgment of acquittal on Count 23, a racketeering charge under 18 U.S.C. § 1962(c) in favor of Hess, Harry W. Rodgers, III, and William A. Rodgers. Section 1962(c) states:
 
 
 113
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 114
 The trial judge ruled that the "conduct or participate" language in the statute required "some involvement in the operation or management of an enterprise," and found that the government's evidence had not met this requirement. He therefore entered a judgment of acquittal. The government appeals from this judgment and argues that the trial court erroneously construed the statutory requirements.
 
 
 115
 The first issue is whether the government has a right to an appeal in this setting. Several recent Supreme Court cases have articulated the general principle that the government cannot appeal from an acquittal, either by jury or judge, when a new trial or further fact finding proceedings would be required if the government were to be successful. See United States v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). Thus, the double jeopardy clause has been construed to protect against successive trials, and not to bar all appeals by the government. If the jury's guilty verdict can be reinstated if the government prevails, then double jeopardy does not bar the appeal from a judgment of acquittal. United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). Two recent opinions may have cast some doubt on this analysis by emphasizing the finality of acquittals as a reason for barring government appeals from any judgment of acquittal. See Sanabria v. United States, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); United States v. Martin Linen Supply Co., 430 U.S. 564, 576, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) (Justice Stevens concurring). However, despite these indications, the statement in Wilson has never been repudiated, and, indeed, the Court has declined to repudiate it, in subsequent recent decisions. United States v. Scott, 437 U.S. 82, 91 n. 7, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); United States v. Martin Linen Supply Co., 430 U.S. 564, 570, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). Our circuit has analyzed the effect of Martin Linen Supply on Wilson and, on facts identical to the case at bar, we held that the statement in Wilson was unaffected by Martin. United States v. Burroughs, 564 F.2d 1111 (4th Cir. 1977). Therefore, we are constrained to follow circuit precedent which allows the government to appeal from a judgment of acquittal entered after the jury has returned a guilty verdict. Other circuits have reached the same result. United States v. Allison, 555 F.2d 1385 (7th Cir. 1977); United States v. Cahalane, 560 F.2d 601 (3d Cir. 1977); United States v. Donahue, 539 F.2d 1131 (8th Cir. 1976).
 
 
 116
 Turning to the merits, the district judge held that the "conduct or participate" language in § 1962(c) required some involvement in the operation or management of the business, and that on the facts of this case the transfer of the partnership interest from Hess to Mandel did not meet this requirement. His opinion was based largely on the legislative history to Title IX of the Organized Crime Control Act of 1970, particularly the repeated use of the word "operation" in describing the purpose of § 1962(c). See U.S.Code Cong. & Admin.News, 91st Cong., 2d Sess. p. 4007 et seq. (1970). For example, the legislative analysis of Title IX (now 18 U.S.C. § 1961 et seq.) begins with the following statement:
 
 
 117
 "This title creates a new chapter in title 18, entitled 'Racketeer Influenced and Corrupt Organizations,' which contains a threefold standard (1) making unlawful the receipt or use of income from 'racketeering activity' or its proceeds by a principal in commission of the activity to acquire an interest in or establish an enterprise engaged in interstate commerce; (2) prohibiting the acquisition of any enterprise engaged in interstate commerce through a 'pattern' of 'racketeering activity,' and (3) proscribing operation of any enterprise engaged in interstate commerce through a 'pattern' of 'racketeering activity.' " U.S.Code Cong. & Admin.News, supra, at 4010.
 
 
 118
 As the district court said: "A comparison of the language used above to describe Section 1962(c) with the language of Section 1962(c) indicates that the words 'operation of any enterprise' were meant to describe the phrase 'conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs.' "
 
 
 119
 The district court also noted that the main purpose of Congress in enacting Title IX was to prevent the infiltration of legitimate business by organized crime. Thus, § 1962(a) prevents the use or investment of racketeering profits in any business which affects interstate commerce, and § 1962(b) prevents the acquisition of any business interest through a pattern of racketeering activity. Section 1962(c) may be viewed as complementing subsections (a) and (b) by covering the situation where a present owner or employee of a business begins to operate the business through a pattern of racketeering activity.
 
 
 120
 We have reviewed the legislative history of 18 U.S.C. § 1962(c) and have concluded that the district court was correct in its interpretation. We find additional support for its view in the use of the word "through" in the statute which would seem to require proof of some connection between the pattern of racketeering activity and the conducting or operating of the business. Indeed, this connection must be shown if the word "through" is to have any meaning in the statute. Without the word "through", anyone who used income from a legitimate business to participate in racketeering activity would be guilty of a violation of § 1962(c). We do not believe Congress meant to sweep so broadly, especially in light of the mandatory forfeiture penalties for a § 1962 violation. 18 U.S.C. § 1963(a).
 
 
 121
 The Seventh Circuit dealt with this question and held that a connection between the predicate offenses and the charged business must be shown. United States v. Nerone, 563 F.2d 836, 851 (7th Cir. 1977). The court agreed with the defendant's contention that:
 
 
 122
 the Congressional use of the word "through" in § 1962(c) was not intended to be meaningless. They submit, correctly we think that the most logical definitions to ascribe to that word as used in the statute are "by means of, in consequence of, by reason of." See Black's Law Dictionary 1652 (Rev. 4th ed. 1968). Their fundamental contention, although we have somewhat paraphrased it, is that if the word "through" is to have operative meaning, the Government must offer some proof that the affairs of the charged enterprise were conducted through a pattern of racketeering activity or through collection of unlawful debt.
 
 
 123
 The Government's case must fail because of a total want of proof of the connection between the racketeering activities and affairs of (the charged enterprise).
 
 
 124
 563 F.2d at 851-52.
 
 
 125
 See also United States v. Rubin, 559 F.2d 975, 990 (5th Cir. 1977) (discussing but not deciding the issue). We are aware of the possibly contrary language in United States v. Stofsky, 409 F.Supp. 609, 613 (S.D.N.Y.1973), aff'd 527 F.2d 237 (2d Cir. 1975). However, the issue in Stofsky was whether § 1962 was unconstitutionally vague, and the question before us was not before that court. The Second Circuit in affirming did not discuss the question.
 
 
 126
 Having determined that the district court was correct in its construction of § 1962(c), we now consider whether the evidence produced by the government against the defendants met the statutory requirement. Basically, the government proved that Hess transferred part of his interest in Security Investment Company to Governor Mandel, and that Hess mailed Mandel several checks representing Mandel's share of Security's profits. The district court held that this transfer did not establish the connection between the business and the predicate offenses required by § 1962(c). In support of its position, it noted that while Congress specifically outlawed the acquisition of a business through a pattern of racketeering activity it did not specifically proscribe the transfer of an interest in an enterprise. Second, transfer of an interest in a business is the antithesis of operating it. Third, the district court pointed out that Mandel's interest was purely passive, and that he was not entitled to any management role and did not have any. Finally, the district judge distinguished the situation where the charged enterprise is merely a front for racketeering activity.
 
 
 127
 We agree with the opinion of the district court. There is no doubt that Security was a perfectly legitimate business, and the simple transfer of an ownership interest in that business does not constitute the conduct of the business through a pattern of racketeering activity even if the transfer is part of an alleged payoff in a mail fraud scheme. We see no difference between this transfer and the transfer of stock or any other business interest. The transfer may even be in payment for unconnected criminal activity as the government alleges here, but this fact does not, in itself, cause the business, the interest in which is transferred, to become a racketeer influenced organization proscribed by § 1962(c) absent other proof not present in this record.
 
 
 128
 We think the government's reading of the statute is impermissibly broad and is not supported by the legislative history or the language of the statute. We therefore affirm the judgment of acquittal on count 23.
 
 IX
 
 129
 The convictions of the defendants on the other racketeering charges (Governor Mandel in Count 21) (Hess, Rodgers, William Rodgers, Kovens, and Cory in Count 24) must also be vacated and remanded for a new trial for they depend in whole or in part upon the mail fraud convictions.
 
 CONCLUSION
 
 130
 The judgments of acquittal on Count 23 of the indictment are
 
 
 131
 AFFIRMED.
 
 
 132
 The judgments of conviction on such other counts of the indictment as to which the defendants were not acquitted or which were not dismissed are
 
 
 133
 VACATED AND REMANDED FOR A NEW TRIAL.
 
 
 134
 It follows that the order of forfeiture is also
 
 
 135
 VACATED AND REMANDED.
 
 BUTZNER, Circuit Judge, dissenting:
 
 136
 The trial of this lengthy case required the able, experienced district judge to whom it was specially assigned to make many rulings involving the admission and exclusion of evidence and to explain to the jury in clear and concise terms the principles of law on which both the prosecution and the numerous defendants relied. To do justice to both sides, he had to exercise in full measure the discretion entrusted to a trial judge. Such discretion, of course, is not unbridled. Its exercise must be firmly grounded on pertinent law and rules of court. But even when a trial judge faithfully adheres to these constraints, he must necessarily exercise judgment in applying the stark letter of the law to the facts that are the subject of controversy. My study of the record convinces me that the trial judge responsibly discharged this duty. I find no cause for reversal in the numerous assignments of error that question the exercise of his discretion. Consequently, I would affirm the convictions. Parts I through IV deal with those issues on which my brothers and I differ. Part V discusses briefly the appellants' contention, which my brothers do not decide, concerning the sufficiency of the evidence.
 
 
 137
 * The appellants assign error to the district court's refusal to give two of their proffered jury instructions. In assessing these claims of error, we must recognize that the district court has substantial discretion as to the wording of specific instructions. United States v. Garcia, 562 F.2d 411, 416 (7th Cir. 1977). Whether the jury was properly instructed can only be determined from reading and considering the charge as a whole. 2 Wright & Miller, Federal Practice & Procedure § 485 at 297 (1969); See, e. g., United States v. Garrett, 574 F.2d 778, 781-82 (3d Cir. 1978). I believe that the charge in this case was well within the scope of the district court's allowable discretion.
 
 
 138
 First, the appellants challenge the court's refusal to give an instruction in connection with the mail fraud counts which would have defined bribery in accordance with United States v. Arthur, 544 F.2d 730, 734-36 (4th Cir. 1976). They assert that this omission may have allowed the jury to confuse legally innocent benefits with bribes and to premise the mail fraud convictions on that confusion.
 
 
 139
 In fact, the court fully complied with Arthur. The court charged the jury as follows:
 
 
 140
 The Government contends that Defendants Hess, Harry and William Rodgers bribed Mandel by giving him a four-ninths interest in Hess's 9 percent interest in the Security Investment Company in order to influence him in the performance of his official duties. Defendants Mandel and Hess contend that Hess assigned only an interest in the income of Security Investment Company to Mandel for the purpose of paying legal fees earned by Defendant Mandel before he became Governor. They deny such interest was a bribe.
 
 
 141
 Defendants William Rodgers and Harry Rodgers contend that they had no involvement in this transaction; that it was purely a personal matter between Hess and Mandel.
 
 
 142
 The Government further contends that Hess, Harry and William Rodgers bribed and attempted to bribe Marvin Mandel by transferring to him a 15 percent interest in certain assets later formally acquired by Ray's Point, Inc., in order to influence him in the performance of his official duties; that Mandel received such interests without (in)curring any personal liability on the note or notes signed by some of the purchasers of the property including Hess, Harry and William Rodgers.
 
 
 143
 Defendants Mandel, Hess, Harry and William Rodgers contend that this was a legitimate business transaction, that Mandel paid for his interest in Ray's Point, Inc., and that the transaction complied with the law in every respect.
 
 
 144
 Bribery imparts the notion of some more or less specific quid pro quo. Quid pro quo means the giving of something in exchange for something else. Not every gift, favor (or) contribution made to or received by a public official constitutes bribery. The crime of bribery occurs only if the gift or favor is coupled with a particular criminal intent. The crime of bribery requires that there be a gift or favor received by a public official as a quid pro quo. This requirement would be satisfied if the jury were to find beyond a reasonable doubt a course of conduct or favors flowing to a public official in exchange for an official act, or in exchange for a pattern of official actions favorable to the donor even though no particular gift or favor is directly connected to any particular official act. This requirement would also be satisfied if a gift were made or a favor were done upon the condition that the public official act favorably to the donor when necessary.
 
 
 145
 As to a public official, the requisite intent is not supplied merely by the fact that he received a gift or favor with knowledge that it was motivated by some generalized hope of some ultimate benefit on the part of the donor. It is necessary to the crime of bribery that the public official received the gift or favor with knowledge that the benefits were conditioned upon his performance of an official act, a pattern of acts, or an express or implied agreement to act favorably to the donor when necessary and with intent that he be so influenced in the performance of his official duties.
 
 
 146
 As to the donor, the requisite intent is not supplied by the fact that he was motivated by making the gift or doing a favor by some generalized hope of some ultimate benefit on his part. The practice of promoting a favorable social climate by making gifts or doing favors for a friend does not amount to bribery if motivated by friendship alone, and no official action is expected in return.
 
 
 147
 A legitimate good faith business transaction not involving the giving of something of value in exchange for official action is not a bribe. The crime of bribery requires that something of value be given to a public official in exchange for or as compensation for official action. Thus, a distinction between conduct that constitutes the crime of bribery and conduct that does not is the existence or nonexistence of criminal intent that the benefit be received by the public official in exchange for some official act, a pattern of acts, or an expressed or implied agreement to act favorably to the donor when necessary.
 
 
 148
 This explanation faithfully conforms to Arthur. The court also repeatedly stressed the legal requirement of a quid pro quo when discussing the contentions of the individual defendants. The appellants stress, however, that the quoted instruction defining bribery was given in connection with the racketeering counts of the indictment and argue that it should also have been given in connection with the mail fraud counts.
 
 
 149
 Repetition of the instruction was unnecessary. The government relied on proof of the same gifts to Mandel, and the same favors he bestowed, to prove both the mail fraud counts and the racketeering counts. Hence, there is no basis for finding that Mandel was prejudiced by the court's refusal to repeat the instruction. The appellants cite no authority requiring the court to repeat instructions when the government offers the same evidence to prove more than one offense in a multi-count indictment. Indeed, we have held that "(r) epetitious and unnecessarily long charges are confusing to a jury and prevent it from exercising its function." United States v. Salliey, 360 F.2d 699, 702 (4th Cir. 1966). The court properly exercised its discretion by declining to give the repetitive instruction.
 
 
 150
 Second, Mandel contends that the district court erred in refusing to instruct the jury that
 
 
 151
 (a)ctual knowledge that some of the co-defendants had purchased Marlboro Racetrack and owned its stock during the 1972 session of the Maryland General Assembly is an essential element of the offense charged against the Defendant Mandel in this case.
 
 
 152
 The judge accepted this as a proposition of law, but he found it unnecessary to instruct the jury in these precise terms.
 
 
 153
 The judge instructed the jury that a scheme to defraud is a necessary element of a mail fraud offense and that a scheme to defraud involves "intentional use of false or fraudulent representations." He also told the jury that Mandel could not be convicted of mail fraud unless he had knowingly participated in the scheme to defraud alleged in the indictment. He emphasized this by explaining: "The purpose of adding the word 'knowingly' is to ensure that no one will be convicted for an act done because of mistake, or accident, or other innocent reason." Elsewhere in the instructions, the judge fully explained the alleged scheme and set forth the government's contentions, which embraced proof that Mandel knowingly promoted the interests of his friends.
 
 
 154
 To prevent any possibility that the jury would be misled, the court explained in detail Mandel's contentions, including his claim that he knew nothing about the ownership of Marlboro during the 1972 session of the General Assembly. Only by reading the charge as a whole can one appreciate the care with which the court charged the jury. The following extracts, however, will serve to expose the fallacy of this assignment of error. The judge told the jury:
 
 
 155
 Defendant Mandel denies that he participated in any of the alleged unlawful activities allegedly engaged in by the other Defendants, or that he had any knowledge of such activities. He had nothing to do with any change of ownership in Marlboro in 1971. If anyone acquired an interest in Marlboro as nominee for another, such fact was not known to him. When it was represented to the general public and to others that a certain Eugene Casey headed the group which had purchased the track, Defendant Mandel accepted the representation as true. Mr. Hess and the Rodgers brothers actively and consciously withheld from him the fact that they had acquired ownership interests in Marlboro for fear that he would be concerned over possible political embarrassment.
 
 
 156
 Mandel further says that he did not, along with the other Defendants or anyone else, fraudulently conceal from the Legislature the true identities of the owners of Marlboro.
 
 
 157
 He says that alleged misstatements by others concerning the identities of the Marlboro stockholders were neither made by nor participated in by him, and that he had no knowledge that such statements were untrue. He says that Casey represented to him that Casey was the head of Marlboro and the leader of its new owners.
 
 
 158
 Furthermore, while discussing the contentions of Harry Rodgers, the court noted Rodgers's claim that "Mandel was unaware of the other defendants' ownership of Marlboro until late 1972."
 
 
 159
 When the whole charge is considered, it is apparent that the court adequately explained to the jury that Mandel's knowledge of Marlboro's ownership was an essential part of proof that he participated in the scheme to defraud. The court also explained that if the jury had a reasonable doubt about any defendant's participation in the scheme, the jury would be obliged to acquit that defendant of mail fraud. Since the court fully instructed the jury on this issue, Mandel was not entitled to insist upon an instruction identical to his request. See United States v. Westbo, 576 F.2d 285, 288-89 (10th Cir. 1978); United States v. Rothman, 567 F.2d 744, 752 (7th Cir. 1977). The court was free to use its own language, so long as it adequately and correctly advised the jury of the material issues. See United States v. Scheper, 520 F.2d 1355, 1357-58 (4th Cir. 1975). The instructions were entirely within these bounds.
 
 II
 
 160
 The appellants complain: "The court below abused its discretion in admitting evidence relative to the Maryland Code of Ethics and the motivations of the Maryland General Assembly." I will discuss these alleged incidents of abuse of discretion separately, treating first the assignment of error about the Maryland Code of Ethics.
 
 
 161
 Examination of pertinent extracts of the Code and consideration of the judge's charge to the jury dispel any notion that he abused his discretion with respect to this incident of the trial. In addition to a brief preamble, the following portions of the Code were introduced:
 
 
 162
 Now, therefore, I, Marvin Mandel, Governor of the State of Maryland, by virtue of the authority vested in me as Governor and by Section 14A of Article 41 of the Annotated Code of Maryland (1957 Edition, 1968 Supplement) hereby promulgate the following Code of Ethics, effective immediately, applicable to all officers and employees of the executive branch of the State Government.
 
 
 163
 Article I.
 
 Declaration of Policy
 
 164
 State officers and employees are responsible to all of the people of the State and not to any favored segment or group. The business and affairs of the State must be conducted in such an impartial manner that all persons understand that no State officer or employee can be improperly influenced. State officers and employees must avoid all situations where prejudice, bias, or opportunity for personal gain could influence their decisions. They must equally avoid circumstances suggesting that favoritism or personal gain is a motivating force in the conduct of State Government.
 
 
 165
 It is the intent of this Code to set forth the minimum ethical standards to be followed by officers and employees of the executive branch of the government. These standards are intended not only to require officers and employees to avoid activities that might result in using a public office or employment for private gain or the giving of favored treatment to any organization or person but also to maintain public confidence in the executive branch by prohibiting activities that might permit opportunity for personal gain or personal preference to influence decisions. The objectives are to maintain an impartial administration of the State government and to maintain public confidence in
 
 
 166
 government. Standards of Ethical Conduct for State Officers
 
 
 167
 and Employees
 
 
 168
 It shall be considered unethical for any State officer or employee:
 
 
 169
 1. To accept, seek, solicit, or take directly or indirectly, any gift or benefit of more than insignificant economic value, including money, any service, gratuity, fee, property, loan, promise, or anything else of more than insignificant economic value from or on behalf of any individual or entity who is doing or is seeking to do business of any kind with the State or whose activities are regulated or controlled in any way by the State, and the officer or employee has knowledge of such facts, under circumstances from which the officer or employee could reasonably have inferred that the gift or benefit was intended to influence such officer or employee in the performance of his official duties and under circumstances from which it is reasonable to assume that the officer or employee would be influenced in the performance of his official duties.
 
 Application
 
 170
 The standards of ethical conduct set forth in this Code of Ethics shall be applicable without exception to all part-time and full-time officers and employees in the executive branch of the State of Maryland whether or not they are members of the Merit System or exempt from the provisions of the Merit System.
 
 
 171
 All officers and employees who have been appointed by the Governor shall conform to these standards without further directive. All other officers and employees who serve under a State appointing authority which is appointed by the Governor shall comply with the agency code of ethics to be issued by such respective authorities as provided for in Article VI hereof. Failure to conform to the standards of ethical conduct so prescribed may lead to removal from office, termination of employment, or other action as the particular case may require.
 
 
 172
 The appellants challenge the introduction of the Code on the ground that as a matter of state law it was inapplicable to Mandel because he was a constitutionally elected official. They also contend that its introduction was prejudicial and therefore it should have been excluded under Federal Rule of Evidence 403.
 
 
 173
 As the instructions indicate, however, the judge expressly informed the jury that under state law the Code did not apply to Mandel. He instructed them that they could consider the Code only for the limited purpose of illuminating whether Mandel acted with the requisite intent to defraud. He instructed the jury as follows:
 
 
 174
 Now, during the trial a good deal has been said about the code of ethics, and at this point the Court will try to explain to the jury what part the code of ethics plays in this lawsuit, if any.
 
 
 175
 A portion of the code of ethics promulgated by Marvin Mandel, the Governor of Maryland, has been introduced into evidence. As a matter of State law, this code does not apply to Marvin Mandel because it was intended to apply only to officers and employees of the Executive Branch of Government. The code does not deal with constitutionally elected officers such as the Governor. Nevertheless, the code may be looked to the code may be looked to as a guide for determining the standard of conduct expected of public officials by the State of Maryland.
 
 
 176
 You may consider compliance with or a knowing violation of such standards for whatever bearing it has, if any, on the issue of whether the Government has proved beyond a reasonable doubt that Defendant Mandel acted with intent to defraud.
 
 
 177
 The failure of a public official to disclose a conflict of interest or the concealment thereof constitutes fraud only if it is done with intent to deceive and for the purpose of gaining some valuable undue advantage or injuring something of value.
 
 
 178
 When the district court's instructions concerning the Code are read in context with its very detailed instructions concerning intent to defraud, it is apparent that the jury could not have been misled or confused. The court explained to the jury:
 
 
 179
 To act with intent to defraud means to act knowingly with the specific intent to deceive, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self.
 
 
 180
 Thus, there is no justification for speculating that the jury convicted Mandel on the basis that the Code "proscribes not only impropriety, but the appearance of it."
 
 
 181
 The appellants' reliance on United States v. Morlang, 531 F.2d 183 (4th Cir. 1975) is misplaced. Morlang involved a prosecution for conspiracy to bribe the director of the Federal Housing Administration in connection with an FHA-insured housing project. The essential element of the substantive crime was the solicitation by a public official of a bribe in return for either violating his official duty or being influenced in the performance of an official act. Thus, in Morlang it was necessary for the jury to determine what would constitute a violation of the director's official duty. We held that it was error for the judge to instruct the jury on general standards of conduct required of HUD employees which were "too indefinite and vague to be a part of our criminal law . . ." 531 F.2d at 192. We also pointed out that the jury should have been instructed only about the specific duties or modes of conduct expected of the director.
 
 
 182
 The instant case differs in several important respects from Morlang. First, the portions of the Code introduced at trial do not pertain to "broad ethical and moral percepts" as did the regulations rejected in Morlang. Second, and more importantly, the Code was admitted only for whatever bearing it might have on Mandel's intent to defraud and not as a standard of conduct. Mandel's knowledge of the Code and his promulgation of it to govern the actions of other public officials are relevant with respect to whether he acted knowingly with the specific intent to defraud.
 
 
 183
 The issue of intent is a factual question that can seldom be proved by direct evidence since there is no way to fathom or scrutinize the human mind. Intent may be inferred from the conduct of the defendant and from all facts and circumstances of a case which tend to show a mental attitude. "Collateral and related conduct may be considered by the jury for the purpose." United States v. Browning, 390 F.2d 511, 512 (4th Cir. 1968). In light of the inherent difficulty in proving intent, it is particularly important that a trial judge be given broad discretion when ruling on the relevance of evidence bearing on this issue. The Supreme Court has stated that those who attack evidentiary rulings on appeal
 
 
 184
 have very much the laboring oar in showing that such rulings constitute reversible error, since "in judicial trials, the whole tendency is to leave rulings as to the illuminating relevance of testimony largely to the discretion of the trial court that hears the evidence." (citations omitted).
 
 
 185
 Hamling v. United States, 418 U.S. 87, 124-25, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974).
 
 
 186
 I find no ground for reversal in the claim that the district judge abused his discretion by admitting this evidence.
 
 III
 
 187
 The appellants also charge that the "court below abused its discretion in admitting evidence relative to . . . motivations of the Maryland General Assembly." The alleged breach of discretion involved the admission of evidence concerning Mandel's activities with respect to two bills calculated to advance the interests of his co-defendants. The appellants contend that this evidence was inadmissible hearsay.
 
 
 188
 The appellants' assignment of error is groundless for two reasons. First, as my brothers recognize, much of the testimony was not hearsay at all. Second, the hearsay statements properly were admitted under a recognized exception to the hearsay rule.
 
 
 189
 Proof of Mandel's influence on the vote that overrode his veto depended largely on circumstantial evidence. The government could not show that Mandel openly proclaimed his change of position on this legislation shortly after his co-defendants acquired their interest in the track that would be affected by it. The district judge took a common sense approach to the introduction of this evidence. He permitted both the prosecution and the defense to call state senators to explain the events that culminated in the overriding of the veto. In short, he allowed the principal actors to recount their own versions of this legislative drama.
 
 
 190
 Most of the evidence was not hearsay. The ten Maryland state senators who testified for the government primarily related the activity they had observed in the state capitol on the day of the vote that led them to believe the override of Mandel's veto was unusual. The senators noted that the override passed by a remarkably broad margin with most of Mandel's supporters in the majority. They also reported the conspicuous failure of Mandel's legislative aides to lobby, as they normally did, in support of his veto. Indeed, when Senator Snyder asked one liaison aide about the administration's position on the override, the aide simply shrugged his shoulders and walked away. These observations alone established a factual foundation for the senators' contemporaneous impressions that Mandel did not object to the veto override. Coupled with Eugene Casey's January 7th letter to all legislators about the recent change of ownership at Marlboro Racetrack, those impressions provided a basis for the senators' testimony that the override was suspicious. Thus, the senators' testimony about their observations, their statements about their own well-founded contemporaneous impressions, and their adoption on the witness stand of statements they made to other senators at the time present no evidentiary problems.
 
 
 191
 The senators, however, could not fully recount the events of the day without reference to statements made by their colleagues during the consideration of the override. They testified that they heard various members of the Senate discuss the Governor's lack of support for his veto or express amazement at the peculiarity of the circumstances surrounding the override. The controversy concerning the introduction of hearsay evidence centers on testimony about Senator Staten's declarations. This aspect of the case warrants special scrutiny because he was the majority whip and other senators recognized that he spoke authoritatively. Senator Crawford testified:
 
 
 192
 We were in the Senate lounge, and I had already promised Senator Snyder that I would vote to override the veto because of his own problems in Hagerstown. I was approached by Senator Roy Staten, who was the majority whip at that time, and he told me in words to the effect that the Governor would like the veto overridden or, "Marvin won't mind having it overridden," or words to that effect.
 
 
 193
 I then told Senator Staten, or words to the effect, "What the hell is going on here," and I had already promised Senator Snyder I was going to override anyway. I didn't care what the Governor wanted. This happened very quickly. The bells rang and we went back in to vote.
 
 
 194
 Senator Thomas also testified about a conversation in the Senate lounge with Senator Staten as follows:
 
 
 195
 Q What, if anything, did Senator Staten say regarding the attitude of Governor Mandel on this matter?
 
 
 196
 A I think he indicated that the Administration would not object to an override on the bill.
 
 
 197
 Q When you say the Administration, was that the phrase he used, "the Administration"?
 
 
 198
 A I think he said the Governor would not object.
 
 
 199
 The appellants argue that Senator Staten's declarations were inadmissible because he was not the Governor's agent. The critical issue, however, is not whether Senator Staten was Mandel's agent, making his statements admissible under Rule 801(d)(2)(D). That claim has been resolved against the prosecution, and I find no reason for reopening it here. The critical issue is whether Senator Staten's statements, concededly hearsay, are admissible under an exception to the hearsay rule. The following colloquy which occurred while an assistant United States attorney was questioning one of the senators illustrates the issue:
 
 
 200
 Q Senator Snyder, the veto was overridden?
 
 
 201
 A Yes, it was.
 
 
 202
 Q I believe the vote was 31 to 8 in the Senate?
 
 
 203
 A Yes.
 
 
 204
 Q I believe you used the word amazement at one point about that vote. What observations did you make on the floor of the Senate that day, either of your own or on the basis of discussing the matter with other Senators that would contribute to your impression of amazement?
 
 
 205
 (DEFENSE ATTORNEY): Well, that is not asking facts. Shouldn't the question be what did you see, what did you hear, what did you observe?
 
 
 206
 THE COURT: I think so. I think so.
 
 
 207
 (DEFENSE ATTORNEY): I object to hearsay, of course, your Honor.
 
 
 208
 This exchange demonstrates the problem of asking a witness to explain the events of the day by telling what he heard without resorting to hearsay. The district court resolved this dilemma by relying on Federal Rule of Evidence 803(24). This rule provides:
 
 
 209
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 
 
 210
 (24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
 
 
 211
 I believe that the district judge correctly held that the senators' hearsay testimony, particularly the statements of Senator Staten, satisfied all the requirements of the rule.
 
 
 212
 In the first place, the senators' hearsay statements have circumstantial guarantees of trustworthiness equivalent to those that support other exceptions to the hearsay rule. The senators made the statements while they were perceiving the very event about which they testified, namely the activity surrounding the vote on the veto. The statements expressed the senators' present impressions immediately before or after the override vote. Thus, the statements were quite like the hearsay declarations of present sense impression admissible under Rule 803(1). See United States v. Iaconetti, 406 F.Supp. 554, 559 (E.D.N.Y.), Aff'd, 540 F.2d 574, 577-78 (2d Cir. 1976).
 
 
 213
 The availability of the declarants is another strong indication of the reliability of these statements. See United States v. Leslie, 542 F.2d 285, 290 (5th Cir. 1976). All the senators present on the day of the veto override, except two who had died before the trial, were available as witnesses. In fact, 17 of the surviving 38 senators actually testified. Thus, there was ample opportunity for the cross-examination of the senators who made or heard comments about the peculiarity of the vote on the Governor's veto.
 
 
 214
 The conduct of the Governor's legislative aides and Mandel's own admission of interest in other racing legislation favorable to his co-defendants corroborated the senators' testimony. A number of witnesses noted the absence of lobbying by Mandel's aides to support his veto. That testimony, as my brothers recognize, was not hearsay. Eyewitnesses also testified that Mandel himself later called several senators to private conferences at which he indicated his particularly strong desire for passage of the racing consolidation bill. In another instance, Mandel attended a meeting in a hotel suite where defendant Dale Hess and the Governor's legislative liaisons had gathered to review a list of the members of the Maryland House of Delegates and assess the prospects for lobbying the consolidation bill through that branch of the legislature. This evidence was not hearsay. Rule 801(d)(2)(A).
 
 
 215
 Senator Staten's statements carried additional guarantees of trustworthiness. He was the whip of the Governor's own majority party. The other senators recognized that he spoke authoritatively about the administration's position. Indeed, the evidence showed without contradiction that Staten worked closely with Mandel to secure passage of the closely related consolidation bill. Furthermore, all controversy about Senator Staten's role was thoroughly explored when he testified for the defense. He denied making the declarations attributed to him, and he also denied ever talking with Mandel about the veto override. Thus, the jury was furnished all the evidence on this point and was free to make its own assessment of credibility. A declarant's denial of the statements attributed to him does not make the hearsay statements inadmissible; it simply calls into question their credibility. See United States v. Iaconetti, 406 F.Supp. 554, 559 (E.D.N.Y.), Aff'd, 540 F.2d 574, 577-78 (2d Cir. 1976).
 
 
 216
 From all these indicia of reliability, I conclude that the senators' hearsay testimony about the statements made by their colleagues, including Senator Staten, on the day the veto was overridden amply satisfied the threshold test for admissibility under Rule 803(24).
 
 
 217
 The district court properly admitted this testimony because it also met the four subsidiary requirements of the rule. First, the statements were offered as evidence of a material fact within the meaning of Rule 803(24)(A). Evidence regarding Mandel's alleged change of position on the vetoed bill was highly probative of the government's contention that Mandel deprived the citizens of Maryland of his faithful services by favoring the business interests of the other defendants. See United States v. Leslie, 542 F.2d 285, 291 (5th Cir. 1976).
 
 
 218
 Second, the statements were more probative of Mandel's position on the veto override than any other evidence that the prosecutors reasonably could have procured. Rule 803(24)(B). The government offered circumstantial evidence of Mandel's failure to resist the override, but the unique difficulty encountered in proving that Mandel had his adherents "spread the word" through the legislature presented the type of special situation for which the hearsay exception in Rule 803(24) was designed. See United States v. Leslie, 542 F.2d 285, 290-91 (5th Cir. 1976). The district court correctly decided that the government should be allowed to elucidate a strong circumstantial showing with the best available testimonial evidence.
 
 
 219
 Third, the general purposes of the Federal Rules of Evidence and the interests of justice were served by admitting the senators' hearsay testimony. Rule 803(24)(C). The policy behind the federal rules favors the admissibility of all relevant and reliable evidence that aids in the prompt and efficient determination of truth. See Rule 102. Admission of the best and most trustworthy evidence available to show Mandel's activities concerning the veto override was consistent with this policy. In political corruption cases, courts should be particularly reluctant to withhold from the jury relevant evidence that sheds light on the defendants' motives and intentions. See United States v. Isaacs, 493 F.2d 1124, 1161-62 (7th Cir. 1974). The interests of justice are not served by impeding prosecutions against public officials simply because the evidence available to the government is necessarily unusual. In view of the special problems attending the proof and interpretation of political maneuvers in a collegial legislative body, the jury was entitled to hear and assess the senators' complete knowledge of the events in which they participated when they voted on the veto.
 
 
 220
 Finally, the government's failure to furnish the names and addresses of the declarants to the defense attorneys does not require reversal. All the declarants were senators. All were known to the appellants. With the exception of two who had died, all were available to testify. As a matter of fact, the appellants do not rely on this provision of the rule for reversal. They had adequate notice of the government's intention to proceed as it did. Indeed, in the first trial of this case, which ended in a mistrial through no fault of any of the participants, a different presiding judge had made the same ruling about the admissibility of this evidence under Rule 803(24).
 
 
 221
 No other court has required literal compliance with the notice provision of the rule when the defendant had a fair opportunity to prepare his case. On the contrary, the principal cases considering the point have dispensed with strict compliance when the defendant could not show that he had been prejudiced. See United States v. Leslie, 542 F.2d 285, 291 (5th Cir. 1976); United States v. Iaconetti, 540 F.2d 574, 578 (2d Cir. 1976); Cf. United States v. Carlson, 547 F.2d 1346, 1355 (8th Cir. 1976) (construing the same notice requirement in Rule 804(b)(5)).
 
 
 222
 Rule 803(24) was not intended to license the introduction of all hearsay. On the other hand, evidence which fairly meets its rigorous requirements should not be excluded. Admission of the testimony from the ten state senators presented by the government did not transgress the rule. Therefore, I find no cause for reversal in the appellants' assignment of error charging the district judge with abuse of discretion in his application of the rule.IV
 
 
 223
 Eugene Cory assigns error to the district court's refusal to permit him to impeach his former secretary, Katherine O'Toole, with testimony by Donna Gardiner, another secretary in his office.
 
 
 224
 The district judge permitted Gardiner to testify at length about O'Toole's veracity. He allowed Gardiner to contradict O'Toole's testimony about specific incidents. He also permitted Cory's counsel to ask Gardiner about O'Toole's reputation for truth and veracity in the community, an inquiry which Gardiner confessed she could not answer. The district court, however, did not permit Gardiner to express her own opinion about O'Toole's veracity, and he held that Gardiner could not "express her opinion as to Mrs. O'Toole's reputation in the community where she works." He based his ruling on the lack of a proper foundation for this type of impeaching testimony.
 
 
 225
 Although Gardiner had worked in the office with O'Toole for one and a half years, she apparently had neither seen nor heard of O'Toole for over four years. When a witness's credibility is at issue, the real question is the witness's reputation for truthfulness at the time of the trial and for a reasonably close period prior to trial. United States v. Lewis, 157 U.S.App.D.C. 43, 51 n.44, 482 F.2d 632, 640 n.44 (1973); United States v. Null, 415 F.2d 1178, 1180 (4th Cir. 1969); McCormick on Evidence § 44 at 92 (2d ed. 1972); Weinstein's Evidence P 608(03) at 608-17 to -18 (1977). The district court, therefore, did not abuse its discretion when it excluded Gardiner's testimony on O'Toole's veracity at a time over four years before the trial.
 
 
 226
 In Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948), the Supreme Court noted that the
 
 
 227
 propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject.
 
 
 228
 Applying that observation to this case, I find no ground for reversal in the alleged abuse of the trial judge's discretion.
 
 V
 
 229
 Each of the defendants asserts that the evidence against him is insufficient to sustain his conviction. My brothers understandably did not decide these assignments of error, but since I think the judgments should be affirmed, I will briefly address them.
 
 
 230
 The majority opinion states the facts and discusses the law. Detailed repetition here would serve no useful purpose. Applying well recognized principles of appellate review explained in Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it is sufficient for me to note that the evidence amply supports the verdicts of guilty returned by the jury against each of the defendants.
 
 
 231
 The evidence established that several months after Mandel vetoed a bill favorable to the Marlboro Racetrack, his co-defendants acquired a controlling interest in the track. Twelve days later, the Maryland General Assembly, which had been misled by some of the defendants about the true identity of the track's new owners, overrode Mandel's veto without opposition from Mandel or his legislative aides. During the same period, some of Mandel's co-defendants secretly made an attractive real estate investment available to him. Subsequently, Mandel lobbied strenuously for the passage of a racing consolidation bill that would have benefitted Marlboro greatly. At the same time, certain co-defendants conveyed to Mandel an interest in other valuable real estate and gave him generous gifts. All of this was accomplished in part through the use of the mails.
 
 
 232
 From this conduct, the jury could find beyond a reasonable doubt that the defendants, using the mails, engaged in a scheme to defraud the citizens of Maryland of the faithful services of Governor Mandel and of the right to have the state's business conducted honestly. The facts also showed that each defendant engaged in a pattern of racketeering activity. Thus, ample evidence supported the convictions for mail fraud and racketeering.
 
 VI
 
 233
 In conclusion, I emphasize that analysis of the assignments of error for which this case has been reversed shows that they are based solely on unsubstantiated charges that the trial judge erred because he did not reiterate certain parts of his charge to the jury and because three of his countless rulings on the admissibility of evidence constituted an abuse of discretion.
 
 
 234
 I venture to say that none of our precedents supports the claim that a district court must give repetitive instructions on the same evidence. Nor have we insisted that a court instruct in the language suggested by a defendant when its charge to the jury adequately explains the point. Our precedents do not support the claim that we should reverse a district court on the ground of abuse of discretion for the admission of relevant evidence or the exclusion of impeaching evidence unless the defendant can show clear prejudice. Indeed, precedents that I have cited fully support the district court's rulings on the issues in this case. Finally, although we have no precedent regarding the residual exception to the hearsay rule embodied in Rule 803(24), other courts of appeals have written on the subject. The district judge's rulings fully conformed to the principles expressed by those courts. I therefore respectfully dissent.
 
 
 
 [1]
 18 U.S.C. § 1341 (mail fraud statute and § 1341) provides:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [2]
 18 U.S.C. § 1962, entitled Prohibited activities, provides in pertinent part:
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 [3]
 The indictment charged Appellants with 20 counts of mail fraud. The jury, after 13 days of deliberation, in the middle of which it was given a modified Allen charge by the district court, returned verdicts of guilty against the Appellants on all but three of the mail fraud counts. The jury returned verdicts of not guilty on counts 5, 6, and 14 (mail fraud) of the indictment. The district court entered judgments of acquittal as to counts 19 and 20 (mail fraud) of the indictment
 Additionally, the indictment charged various combinations of the Appellants with 4 counts of prohibited racketeering activity. Governor Mandel was charged with engaging in a pattern of racketeering activity in counts 21 and 22 of the indictment. Appellants Hess, Harry Rodgers, and William Rodgers were charged with engaging in a pattern of racketeering activity in count 23 of the indictment. And, Appellants Hess, Harry Rodgers, William Rodgers, Kovens, and Cory were charged with engaging in a pattern of racketeering activity in count 24 of the indictment. Count 22 was dismissed prior to trial. The jury returned verdicts of guilty on counts 21, 23, and 24 of the indictment. The district court entered a judgment of acquittal on count 23 of the indictment, from which the government has appealed.
 
 
 [4]
 Each of these investors had a 20 percent interest in Ray's Point, Inc. Lowe is not now the Speaker of the Maryland House
 
 
 [5]
 In this section of the opinion, we are dealing solely with the issue of whether the government's indictment and prosecution of the Appellants constitute an unwarranted overextension of the mail fraud statute. The issue of whether the jury was properly instructed on the law with regard to the mail fraud counts will be discussed Infra
 
 
 [6]
 We have reviewed the record, including evidence that we have determined was improperly admitted, in order to determine the direction of the government's prosecution in this case
 
 
 [7]
 Paragraph 27 of count 1 alleges that, "Marvin Mandel would and did . . . In return for certain financial and other benefits . . . act with intent to aid and assist certain legislation and legislative matters financially beneficial to the owners of the Marlboro Race Track." (emphasis added). Additionally, sub-paragraphs 13(a) and (b) specifically allege that Appellants devised a scheme to defraud the citizens of the State of Maryland of the loyal and faithful services of their Governor and of their right to have the state's business and its affairs conducted honestly and impartially, free from, Inter alia, bribery. Appellants contend that the government abandoned its claim that the alleged scheme involved bribery. There can be no question that a large portion of the government's evidence focused on the alleged scheme to defraud through bribery. The deficiency, if any, that exists with regard to the alleged bribery element in this case relates to the jury instructions, which will be discussed Infra
 
 
 [8]
 Act of June 8, 1872, ch. 335, § 301, 17 Stat. 323
 
 
 [9]
 The essential elements of an offense under the statute are: (1) a scheme to defraud; and, (2) the mailing of a letter, etc., for the purpose of executing the scheme. See, e. g., United States v. Brewer, 528 F.2d 492, 494 (4th Cir. 1975)
 
 
 [10]
 In United States v. McNeive, 536 F.2d 1245, 1248-49 (8th Cir. 1976), the court categorized the various schemes that have been held violative of the mail fraud statute into two general categories. The court stated:
 "The first category, which comprises the bulk of the mail fraud cases, includes the many deceptive schemes which are intended to defraud individuals of money or other tangible property interests. There can be little dispute that these schemes are within the scope of § 1341 since they involve calculated efforts to use misrepresentations or other deceptive practices to induce the innocent or unwary to give up some tangible interest."
 "The second category of § 1341 deceptive schemes is comprised of those which operate to deprive individuals of intangible rights or interests."
 Appellants' alleged scheme to defraud falls within McNeive's second category in that they are charged with devising a scheme and artifice to defraud the citizens of the State of Maryland and its governmental departments, agencies, officials and employees of the right to conscientious, loyal, faithful, disinterested and honest government, i. e., intangible rights and interests.
 
 
 [11]
 Of course, since fraud is a crime requiring specific intent, before non-disclosure or concealment of material information could be deemed actionable fraud cognizable under the mail fraud statute, a specific intent to defraud would have to be proven
 
 
 [12]
 At this point, we note that in United States v. Caldwell, supra, we implicitly held that we would not adopt the construction of the mail fraud statute some contend is required by Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), to the effect that pecuniary or property injury is necessary
 
 
 [13]
 Such an instruction was proffered with regard to mail fraud counts of the indictment, but was refused by the district court. It did give a similar instruction in connection with the racketeering counts
 
 
 [14]
 The district court, in summarizing parts of the indictment, specifically informed the jury of one of the bribery allegations contained in the mail fraud counts of the indictment
 
 
 [15]
 Other than the Code itself
 
 
 [16]
 We have assumed the admissibility of the belief of the senators, no question being made of it